NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190172-U

NO. 4-19-0172

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 14, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Pike County |
| MICHAEL B. PINKETT, | ) | No. 17CF84 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jerry J. Hooker, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Knecht concurred in the judgment.
Justice Turner dissented.

**ORDER**

¶ 1    *Held*: The appellate court reversed and remanded with directions, concluding the trial court erred in denying defendant's motion for a mistrial and the error was not harmless.

¶ 2    After a July 2018 trial, a jury found defendant, Michael B. Pinkett, guilty of aggravated fleeing or attempting to elude a peace officer, a Class 4 felony (625 ILCS 5/11-204.1(a)(1) (West 2016)) and speeding (625 ILCS 5/11-601(b) (West 2016)). The jury acquitted defendant of failure to use a turn signal (625 ILCS 5/11-804(d) (West 2016)). In September 2018, the trial court sentenced defendant to two years' imprisonment.

¶ 3    Defendant appeals, arguing (1) the trial court erred in denying defendant's motion for a mistrial or, in the alternative, defense counsel provided ineffective assistance of counsel by failing to distinguish the State's case law in regard to defendant's postarrest silence, (2) the State

committed prosecutorial misconduct violating defendant's right to remain silent, and (3) defense counsel provided ineffective assistance of counsel by failing to object to the State's pattern of prosecutorial misconduct. We reverse and remand with directions.

¶ 4                                                    I. BACKGROUND

¶ 5            In July 2017, the State charged defendant with aggravated fleeing or attempting to elude a peace officer, a Class 4 felony (625 ILCS 5/11-204.1(a)(1) (West 2016)). The charge stemmed from a June 10, 2017, incident where "defendant, after being given a visual and/or audible signal to stop by a Peace Officer, failed to stop his vehicle and traveled at a speed at least 21 miles per hour over the legal speed limit[.]" Police subsequently arrested defendant in a Walmart bathroom. In July 2018, the State also charged defendant with speeding (625 ILCS 5/11-601(b) (West 2016)) and failure to use a turn signal (625 ILCS 5/11-804(d) (West 2016)).

¶ 6                                      A. Defendant's July 2018 Jury Trial

¶ 7            Below, we summarize the relevant testimony elicited during defendant's July 2018 jury trial.

¶ 8                                            1. *Opening Statements*

¶ 9            Before proceeding to opening statements, the trial court informed the jury that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys, which is not based on the evidence, should be disregarded."

¶ 10           During opening statements, the State informed the jury "[the arresting police officers will] both testify in spite of the fact that they tried to arrest [defendant] there at the Walmart without making a scene since it's in the middle of the store, at no point did he ever ask in any way the reason why he was being detained." Defense counsel objected, and the trial court excused the jury to hear the parties' arguments. Defense counsel made a motion for a mistrial,

arguing that when the prosecutor stated defendant did not say anything or ask why he was being arrested this was an improper comment on defendant's exercise of his constitutional right to remain silent.

¶ 11    The prosecutor indicated he researched the issue prior to trial and stated as follows:

> "In Illinois Practice Volume 5 Criminal Practice and Procedure, on comment about prosecutor on defendant's pre-arrest silence, 16.24, it says, the United States Supreme Court has held *Fletcher v. Weir*[, 455 U.S. 603 (1982),] that the use of [postarrest] silence does not violate the defendant's right to silence.
>
> The basis for the ruling is that because the *Miranda* [v. *Arizona*, 384 U.S. 436 (1966)] warnings have not yet been given. The State gives no assurances to the defendant that his silence would not be used against him, and thus, creates a sense of reliance on the statement by the defendant. The State of Illinois follows this decision. The citation is *People v. Givens*, [135 Ill. App. 3d 810,] 482 N.E.2d 211 [(1985)]. It's a 1985 Fourth District case and it's still the law."

¶ 12    Defense counsel responded that *Givens* was distinguishable because defendant was clearly in custody and counsel reiterated that the State's comments violated defendant's right to remain silent. The trial court stated it understood the parties' positions and knew the *Givens* case. Finding *Givens* applied, the court denied defense counsel's motion for a mistrial and overruled defense counsel's objection.

¶ 13                                    2. *Deputy Brad Wassell*

¶ 14         Brad Wassell, a Pike County sheriff's deputy, testified that on June 10, 2017, around 6 p.m., he observed three motorcycles driving above the speed limit of 55 miles per hour on U.S. 54 in Pike County, Illinois, a two-lane road. Deputy Wassell activated his radar unit and clocked one of the motorcycles traveling at 78 miles per hour in a 55 miles per hour speed limit zone. Deputy Wassell described the motorcycles as driving in a triangle-type formation.

¶ 15         As the motorcycles traveled toward him, Deputy Wassell pulled over to the side of the road in his unmarked police vehicle and activated his emergency lights. After the motorcycles continued to travel past him, Deputy Wassell made a U-turn to follow the motorcycles. Once Deputy Wassell caught up with the motorcycles, he estimated the motorcycles continued to travel between 60-65 miles per hour. At that point, Deputy Wassell activated his emergency siren.

¶ 16         Eventually the motorcycles reached the four-way intersection of U.S. 54 and Illinois 96, and the motorcycles made complete stops at the stop sign. Deputy Wassell deactivated his emergency siren at the four-way intersection. Deputy Wassell, about 10 feet behind the motorcycles, described the front motorcycle as "a Ninja crotch-rocket-style motorcycle." Deputy Wassell also observed the individual driving the Ninja motorcycle wore a "large black knife on his belt that was in a sheath." Deputy Wassell testified the driver of the Ninja motorcycle wore a helmet. Deputy Wassell also testified that when the motorcycles stopped at the intersection, the motorcyclist in the back turned around and made eye contact with him and he motioned for the motorcyclist to stop.

¶ 17         After making complete stops, the motorcycles proceeded through the intersection. As a result, Deputy Wassell reactivated his emergency siren and requested assistance. Deputy

Wassell testified the motorcycles maintained "a 60-mile-an-hour pace." Deputy Wassell continued following the motorcycles from about 200 to 300 feet behind. Deputy Wassell observed a piece of plastic dragged from the bottom of the Ninja motorcycle, the license plate was "blacker" than the others, possibly from dirt or grime, and the motorcycle did not have rearview mirrors. Deputy Wassell testified the motorcyclist on the Ninja-style bike never turned around and looked at him.

¶ 18        After the motorcycles passed through the intersection of U.S. 54 and State Highway 106, Deputy Wassell observed Officer Lisa Hobbs ahead. Before the motorcycles and Deputy Wassell reached Officer Hobbs, she activated her lights. At that point, the motorcycles began traveling in a single-line formation. The motorcycles continued driving and encountered a silver SUV traveling in the right-hand lane. The motorcycles followed the SUV for a mile before they increased their speed to 90 miles per hour to pass the silver SUV. Deputy Wassell testified that when the motorcycles increased their speed to 90 miles per hour, they were in a 45-miles per hour speed zone. Deputy Wassell also passed the silver SUV and continued to follow the motorcycles. Deputy Wassell testified that as he followed the motorcycles into Pittsfield, Illinois, he lost sight of the first two motorcycles, one being the Ninja motorcycle. Deputy Wassell continued following the third motorcycle to an Ayerco Convenience Center where he arrested the driver, Mikhail Williams. Deputy Wassell then transported Williams to the Pike County jail.

¶ 19        Later that evening, Deputy Wassell interviewed defendant at the Pike County Sheriff's Department. Deputy Wassell read defendant his constitutional rights and defendant waived his rights and agreed to speak with Deputy Wassell. When Deputy Wassell asked defendant if he noticed emergency lights while he drove his motorcycle, defendant alleged he did

not see any emergency lights while driving his motorcycle. The trial court allowed excerpts of the video recorded interview to be admitted during Deputy Wassell's testimony.

¶ 20    Deputy Wassell also observed photographs of defendant entering Walmart. On cross-examination, defense counsel asked Deputy Wassell if the photographs showed defendant wearing earplugs around his neck as he walked into Walmart. Deputy Wassell responded, "I don't know if they are earplugs." Defense counsel also asked Deputy Wassell, "if, in fact, a person on one of those motorcycles was wearing something covering his ears, and also had plugs in his ears, the combination of the loud noise of the motorcycle and the plugged ears and the wind, do you believe or would you concede that that person might not be able to hear your siren?" Deputy Wassell responded, "As I previously testified, I could see where it would be more difficult, but again, I don't think I'm the best person to answer that question, sir."

¶ 21                    3. *Officer Lisa Hobbs*

¶ 22    Lisa Hobbs, a part-time Pittsfield police officer, testified that on June 10, 2017, she "heard radio traffic from Deputy Wassell that he was following three motorcycles that were refusing to stop, so I positioned myself." Officer Hobbs positioned herself perpendicular to U.S. 54 on the south side of the roadway, facing north "just a few" feet from the eastbound lane of traffic on U.S. 54. Officer Hobbs testified once she heard Deputy Wassell's siren and observed the motorcycles approaching, she turned on her overhead emergency lights. Officer Hobbs activated her overhead lights before the motorcycles passed her. Officer Hobbs's dash camera started recording when she activated her emergency lights.

¶ 23    Once the motorcycles and Deputy Wassell passed her, Officer Hobbs turned right onto U.S. 54 and activated her emergency siren. Officer Hobbs then followed Deputy Wassell to the Ayerco. After arriving at the Ayerco, dispatch informed Officer Hobbs of a sighting of one

of the other motorcycles. Officer Hobbs responded to the Pittsfield Walmart. Upon arrival at Walmart, Officer Hobbs observed a black motorcycle in the parking lot. Officer Hobbs also observed a black face mask in the parking lot. Officer Hobbs waited outside while Sergeant Matt Frazier went inside Walmart to look for the motorcycle driver. A while later, Officer Hobbs witnessed Sergeant Frazier come out of the Walmart with defendant. Officer Hobbs retrieved a helmet, vest, and knife from Sergeant Frazier.

¶ 24                                4. *Frank Smith*

¶ 25            Frank Smith testified that on June 10, 2017, he pulled into the Pittsfield Walmart parking lot and observed a "sport bike come through Walmart really close to my Jeep at kind of a high rate of speed and kind of startled us, and it went behind Walmart back to, like, the loading dock area for a minute." Smith then heard sirens and observed police chasing an additional motorcycle on the street in front of Walmart. Smith also witnessed a second bike with two individuals on it enter the Walmart parking lot, park by his vehicle, and then exit out of the parking lot. Eventually, Smith witnessed the motorcyclist on the "sports bike" park the motorcycle behind a stack of mulch near the garden center.

¶ 26            Smith contacted Brian Douglas, an off-duty police officer, to inform him of the suspected police chase and "sport bike" that entered Walmart. Smith observed the motorcyclist on the "sport bike" enter Walmart. Smith later came across Officer Hobbs and informed her about the motorcyclist that entered Walmart and where to locate his motorcycle. Smith identified defendant as the individual on the "sport bike" who passed him in the Walmart parking lot and then walked into the store.

¶ 27                            5. *Trooper Brian Douglas*

¶ 28        Brian Douglas, an Illinois State Police trooper, testified that on June 10, 2017, he received a telephone call from Smith reporting "the motorcycle that the police were chasing pulled into Walmart and parked by the mulch." Trooper Douglas "called the sheriff's department and relayed the information."

¶ 29                    6. *Sergeant Matt Frazier*

¶ 30        Matt Frazier, a Pike County sheriff, testified that on June 10, 2017, around 6 p.m., he was off duty when he received a telephone call from Deputy Wassell that "he had three motorcycles that he attempted to stop and they weren't stopping and they were heading towards Pittsfield." Sergeant Frazier reported to the Pittsfield Walmart upon receiving information that one of the motorcyclists entered the store. Upon entering the Walmart parking lot, Sergeant Frazier located the motorcycle outside by the mulch, and he positioned his vehicle in front of the motorcycle to prevent it from leaving.

¶ 31        Sergeant Frazier and Sheriff Paul Petty, both in plain clothes, entered Walmart. Once inside, Walmart employees directed Sergeant Frazier back toward the bathroom to look for the motorcyclist. Sergeant Frazier entered the bathroom and observed defendant washing his hands at the sink. Sergeant Frazier testified defendant appeared "somewhat nervous."

¶ 32        Sergeant Frazier then followed defendant out of the bathroom and identified himself as a deputy sheriff. Sergeant Frazier testified, "[A]t that time I just grabbed that knife from the sheaf [*sic*] that was on his side and pulled it out and I said, 'We need to walk out of the store without making a scene,' and he did it with no problem." Defendant then asked Sergeant Frazier, "Well, how do I know you're actually a police officer?" Defendant also asked Sergeant Frazier to see some identification. Sergeant Frazier explained that he did not have his identification on him but that a uniformed officer was outside the store. Once at the front of the

store, Sheriff Petty handcuffed defendant. Defendant informed Sergeant Frazier of the presence of the sheath on his waist out of concern that someone would get cut. The prosecutor asked whether defendant told Sergeant Frazier why he was in the store. Sergeant Frazier responded, "At some point. It may have been the ride to the jail. He informed me he was buying zip ties for something that came off his motorcycle."

¶ 33        The prosecutor asked Sergeant Frazier, "You talked about walking in from the bathroom to the front. Did he at that point, when you had detained him, ask why he was being detained?" Sergeant Frazier responded, "No, not like somebody going to your side and grabbing—in plain clothes grabbing a knife off your waistband and anything. He didn't act like I was doing anything out of line whatsoever which to me is odd."

¶ 34        On cross-examination, Sergeant Frazier agreed defendant had a right to remain silent and he exercised that right. Sergeant Frazier also observed photographs of defendant entering Walmart. Defense counsel asked Sergeant Frazier if defendant appeared to be wearing earplugs around his neck in the photographs. Sergeant Frazier responded, "It does look like earplugs or headphones or something." Sergeant Frazier did not recall if defendant had earplugs with him when he picked him up inside Walmart.

¶ 35                            7. *Closing Arguments*

¶ 36        During closing arguments, the prosecutor stated as follows:

        "[Defendant] doesn't ask why he's being detained.

        [Defense counsel] made a lot of arguments about he has a right to

        remain silent. Certainly, he has the right to remain silent, but,

        again, you just have to ask yourself what would a normal person

        who, if it's his argument 'it wasn't me, I had nothing to do with

- 9 -

this,' what would that normal person do when someone comes up to you in the bathroom of a Walmart, plain clothes—now, he does say I'm a deputy sheriff—takes your knife and detains you? Don't you think a normal person would say what's this all about, why, why are you detaining me, what's going on? Just, that would be a normal response.

Again, he has the right to say nothing. But you have to ask yourself what would a normal person who had—if that's his argument—nothing to do with this, what would that normal person have said when they're suddenly detained in the bathroom of Walmart? If it's his argument that he had nothing to do with it, surely you would ask what's going on.

* * *

Okay. They're going 60 for a long time and they never have any opportunity to pass. Everybody on this jury, we live in Pike County, sometimes we drive on two-lane roads and sometimes, when somebody else passes, we can't pass behind them immediately. Obviously, that's not how this one worked out. But the way I think of it, I mean I'm not in the business of fleeing from the police but I feel like, if I were, this would be a logical technique. A coordinating maneuver, there's finally an opportunity to pass, it's a two-lane road, everybody suddenly accelerates, which you can do on a motorcycle really fast, and if it

takes the officer 10 seconds to get around that vehicle because of oncoming traffic on a two-lane road, you're gone. I mean that's the idea, that's the technique, and that's the coordinated attempt to flee or attempt to elude that you clearly see on the video."

¶ 37                                        8. *Verdict*

¶ 38         Following deliberations, the jury found defendant guilty of aggravated fleeing or attempting to elude a peace officer and speeding. The jury found defendant not guilty of failure to use a turn signal when required.

¶ 39                              B. Sentence and Posttrial Motions

¶ 40         On July 19, 2018, defendant filed a posttrial motion alleging, in relevant part, that the trial court "erred in denying defense motion for a mistrial based upon the State[']s comments of his refusal to say anything after [d]efendant was arrested in its opening statement."

¶ 41         At a September 20, 2018, sentencing hearing, the trial court first heard arguments on defendant's posttrial motion. Defense counsel argued the State improperly commented on defendant's postarrest silence. Specifically, where the State used defendant's silence as "evidence of guilt because he refused to ask why he was being arrested or to question the individual's authority." Defense counsel stated, "I realize what the case law is on that. To my way of thinking, the case law is wrong. I would ask the court to grant the motion." The trial court found the case law presented by the State at trial to be good law and denied defendant's posttrial motion. Ultimately, the court sentenced defendant to two years' imprisonment.

¶ 42         On October 17, 2018, defendant filed a *pro se* motion to reconsider sentence. On January 24, 2019, defendant filed an amended motion to reconsider sentence. After a February 2019 hearing, the trial court denied the motion.

¶ 43       This appeal followed.

¶ 44                           II. ANALYSIS

¶ 45       On appeal, defendant argues (1) the trial court erred in denying his motion for a mistrial or, in the alternative, defense counsel provided ineffective assistance of counsel by failing to distinguish the State's case law in regard to defendant's postarrest silence, (2) the State committed prosecutorial misconduct violating defendant's right to remain silent, and (3) defense counsel provided ineffective assistance of counsel by failing to object to the State's pattern of prosecutorial misconduct. As we find the issue dispositive, we turn first to whether the trial court erred in denying defendant's motion for a mistrial.

¶ 46       "Generally, a mistrial should be awarded where there has been an error of such gravity that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Sims*, 167 Ill. 2d 483, 505, 658 N.E.2d 413, 423 (1995). "[F]or a reversal following the denial of a motion for a mistrial, the appellant must show prejudice from the introduction of the incompetent evidence at issue and also that the resulting damage could not be remedied by the court's admonitions and instructions." *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 29, 107 N.E.3d 410. The trial court's decision to deny a motion for a mistrial is reviewed for an abuse of discretion. *Sims*, 167 Ill. 2d at 505. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20, 74 N.E.2d 126, 138 (2000).

¶ 47                     A. Defendant's Postarrest Silence

¶ 48       Defendant argues the trial court erred in denying his motion for a mistrial where the prosecutor erroneously commented on his postarrest silence as evidence of guilt during

opening statements. The State argues the court did not err in denying defendant's motion for a mistrial where the prosecutor's comments were proper because defendant's postarrest silence occurred prior to defendant receiving his *Miranda* rights.

¶ 49         During opening statements, the prosecutor stated, "[the arresting police officers will] both testify in spite of the fact that they tried to arrest [defendant] there at the Walmart without making a scene since it's the middle of the store, at no point did he ever ask in any way the reason why he was being detained." Defense counsel objected and made an oral motion for a mistrial, arguing that, when the prosecutor stated defendant did not say anything or ask why he was being arrested, this was an improper comment upon defendant's exercise of his constitutional right to remain silent. In response, the State cited *Fletcher* and *Givens* to argue it could comment on defendant's postarrest silence because *Miranda* warnings had not yet been given. The trial court stated it understood the parties' positions and knew the *Givens* case. Finding *Givens* applied, the court denied defendant's motion for a mistrial and overruled defense counsel's objection.

¶ 50         Defendant argues the case law cited by the State and relied on by the trial court in denying his motion for a mistrial was distinguishable because he never testified and therefore was not impeached with his postarrest, pre-*Miranda* silence. While the State acknowledges the defendants in the cited case law testified at trial, it asserts the principles behind the cases are still applicable here. Specifically, the State asserts the prosecutor was not commenting on defendant's silence in reliance upon government assurances that he could remain silent. Instead, the prosecutor elicited testimony based on reasonable inferences drawn from the evidence or invited by defense counsel. In support of its argument, the States cites to *Doyle v. Ohio*, 426 U.S. 610 (1976), *Fletcher*, and *Givens*.

- 13 -

¶ 51          In *Doyle v. Ohio*, 426 U.S. at 619, the Supreme Court held it is a federal due process violation for the State to impeach a defendant with his postarrest, post-*Miranda* silence. Subsequently, in *Fletcher*, 455 U.S. at 605-07, the Supreme Court found no automatic federal due process violation for the State to impeach a defendant with his postarrest, pre-*Miranda* silence. Specifically, the Supreme Court held, "In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Id.* at 607. The Supreme Court further permitted the state courts to create their own rules. *Id.* Relying on *Fletcher*, the Illinois Supreme Court in *Givens* found no due process violation of the Illinois or federal constitutions where the State used the defendant's postarrest, pre-*Miranda* silence as impeachment of his trial testimony. *Givens*, 135 Ill. App. 3d at 825. We find the cases distinguishable.

¶ 52          Here, defendant did not testify at trial and thus was not impeached with his postarrest, pre-*Miranda* silence. Rather, the prosecutor commented on defendant's postarrest silence as evidence of his guilt during opening statements. Prosecutorial questions and remarks on a defendant's postarrest silence are generally improper, except when used to impeach a defendant's testimony at trial. See *People v. Herrett*, 137 Ill. 2d 195, 213-14, 561 N.E.2d 1, 9-10 (1990). We find the fact defendant did not testify to be significant because a testifying defendant places himself in a different position than a nontestifying defendant. Specifically, a testifying defendant opens the door to impeachment. Here, defendant did not "cast aside his cloak of silence" by testifying at trial. See *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980). Thus, the case law cited by the State and relied on by the trial court in denying defendant's motion for a mistrial was not applicable to defendant's case where he did not testify.

¶ 53　　　　　Moreover, under Illinois evidentiary law, impeachment of a defendant with his or her postarrest silence is impermissible, regardless of whether the silence occurred before or after the defendant was given *Miranda* warnings. *People v. Sanchez*, 392 Ill. App. 3d 1084, 1096, 912 N.E.2d 361, 371 (2009) (citing *People v. Clark*, 335 Ill. App. 3d 758, 763, 781 N.E.2d 1126, 1130 (2002)). "Evidence of the defendant's [postarrest] silence is considered neither material [n]or relevant to proving or disproving the charged offense." *Sanchez*, 392 Ill. App. 3d at 1096 (quoting *Clark*, 335 Ill. App. 3d at 763).

¶ 54　　　　　Under the circumstances here, the testimony regarding defendant's postarrest silence was inadmissible. Because defendant did not testify at trial, the State had no basis to impeach him. Further, the State erred when it commented on defendant's postarrest silence during opening statements, elicited testimony from Frazier about defendant's postarrest silence, and again commented on defendant's postarrest silence during closing arguments. Therefore, we find the trial court abused its discretion when it relied on *Givens* to deny defendant's motion for a mistrial.

¶ 55　　　　　　　　　　　　B. Harmless Error

¶ 56　　　　　The State argues that even if the trial court erred in denying defendant's motion for a mistrial, any error was harmless beyond a reasonable doubt. Here, defendant properly preserved his claim of error, warranting a harmless-error analysis. Thus, the State maintains the burden of persuasion with respect to prejudice. *Middleton*, 2018 IL App (1st) 152040, ¶ 29. For the following reasons, the State fails to sustain its burden in this case.

¶ 57　　　　　The State argues a violation of the *Doyle* rule may constitute harmless error. See *People v. Dameron*, 196 Ill. 2d 156, 164, 741 N.E.2d 1111, 1115-16 (2001). The State cites five factors to consider when deciding whether a violation of the *Doyle* rule was harmless beyond a

- 15 -

reasonable doubt: "(1) the party who elicited the testimony about the defendant's silence; (2) the intensity and frequency of the references to the defendant's silence; (3) the use that the prosecution made of the defendant's silence; (4) the trial court's opportunity to grant a mistrial motion or to give a curative jury instruction; and (5) the quantum of other evidence proving the defendant's guilt." *Id.*

¶ 58          As stated above, *Doyle* presents a different procedural posture than the matter before us where defendant did not testify and was not impeached with his postarrest silence at trial. Even so, we find it appropriate to consider the factors used to determine whether the State has met its burden of proof in showing a *Doyle* violation to be harmless beyond a reasonable doubt.

¶ 59          The State argues that while the prosecutor elicited testimony about defendant's postarrest silence through Sergeant Frazier and referred to that testimony during opening and closing, it only did so after the trial court ruled the testimony admissible. Further, the State alleges the prosecutor sparingly mentioned defendant's postarrest silence. Moreover, the State during closing argument informed the jury that defendant had a right to remain silent.

¶ 60          When analyzing defendant's case under a totality of the circumstances, we cannot find the prosecutor's comments on defendant's postarrest silence and the trial court's ruling were harmless. During opening statements, the prosecutor informed the jury that police officers would testify to defendant's postarrest silence as evidence of his guilt. After defense counsel objected and called for a mistrial, the State provided citations to case law alleging a defendant's postarrest silence can be used to impeach at defendant. However, at this point the State was unaware if defendant planned to testify at trial. Further, while the trial court acknowledged it knew the *Givens* case, the court relied on the State's assurance that defendant's postarrest silence

- 16 -

occurred pre-*Miranda* and neglected to address the fact *Givens* involved impeaching a defendant's trial testimony. Therefore, the court overruled defendant's objection and denied the motion for a mistrial.

¶ 61   The prosecutor next elicited testimony from Sergeant Frazier about defendant's postarrest silence. The prosecutor asked Sergeant Frazier, "You talked about walking in from the bathroom to the front. Did he at that point, when you had detained him, ask why he was being detained?" Sergeant Frazier responded, "No, not like somebody going to your side and grabbing—in plain clothes grabbing a knife off your waistband and anything. He didn't act like I was doing anything out of line whatsoever which to me is odd." Then, on cross-examination, Sergeant Frazier acknowledged that defendant had a right to remain silent and he exercised that right.

¶ 62   During closing argument, the prosecutor acknowledged defendant had the right to remain silent after his arrest but called defendant's actions into question when he stated, "But you have to ask yourself what would a normal person who had—if that's his argument— nothing to do with this, what would that normal person have said when they're suddenly detained in the bathroom at Walmart? If it's his argument that he had nothing to do with it, surely you would ask what's going on."

¶ 63   The prosecutor argued defendant's postarrest silence at every stage of trial. Moreover, the prosecutor failed to cure any prejudice to defendant where he stated during closing argument that defendant has a right to remain silent but then directly called into question defendant's postarrest silence. The prosecutor asked the jury what a "normal person" would do in that situation. The prosecutor invited the jury to view defendant's postarrest silence as an admission of guilt. Further, the prosecutor's comments during closing argument—questioning

- 17 -

defendant's silence while recognizing defendant's right to remain silent, only served to confuse the jury.

¶ 64    The State also argues the trial court had the opportunity to grant a mistrial but as explained above, denied defendant's motion. The court further instructed the jury that prior to opening statements, that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys, which is not based on the evidence, should be disregarded."

¶ 65    While the trial court provided a curative instruction about opening statements and closing argument, the instruction alone is not always curative but rather a factor to be considered in determining the prejudice to defendant. See *People v. Bunning*, 298 Ill. App. 3d 725, 729, 700 N.E.2d 716, 720 (1998). Here, we have the added problem that the prosecutor also elicited testimony from Sergeant Frazier about defendant's postarrest silence.

¶ 66    Last, the State argues that even if the prosecutor did not mention defendant's postarrest silence, the result of the proceedings would not have been different due to the overwhelming evidence of defendant's guilt. Specifically, the State asserts the three motorcycles acted together to elude Deputy Wassell where Deputy Wassell (1) pursued the motorcycles for 13 miles—part of that time with his emergency lights and sirens on—to no avail, (2) observed the motorcycles change formation over the course of the pursuit, and (3) observed the motorcycles speed up to pass a silver SUV. The State further argues defendant's statement to police that he was unaware he was being pursued by police was unbelievable because Officer Hobbs turned on her emergency lights before defendant passed her parked vehicle on the side of the road.

¶ 67        Based on the evidence presented, we decline to find the State presented overwhelming evidence of defendant's guilt. Rather, a reasonable person could find defendant was unaware police officers attempted to stop him. While Deputy Wassell testified he clocked the motorcycles speeding, activated his emergency lights, then proceeded to follow the motorcycles, he admitted he did not initially activate his emergency siren. Only once he caught up to the motorcycles did Deputy Wassell activate his emergency siren. Deputy Wassell testified defendant rode "a Ninja crotch-rocket-style motorcycle" in the front of the pack and wore a helmet. Deputy Wassell also acknowledged that while one of the motorcyclists turned around and looked at him, defendant did not. Deputy Wassell also noticed defendant's motorcycle did not have review mirrors. At the four-way intersection, Deputy Wassell deactivated his emergency siren. After the motorcycles stopped at the four-way intersection, Deputy Wassell reactivated his emergency siren but the motorcycles continued to drive.

¶ 68        Officer Hobbs testified once she heard Deputy Wassell's siren and observed the motorcycles approaching, she turned on her overhead emergency light. However, Officer Hobbs was parked on the side of the road, in front of the motorcycles, with her emergency lights on and did not indicate to the motorcycles that she was in pursuit of them.

¶ 69        Deputy Wassell observed photographs of defendant entering Walmart but stated he did not know if defendant was wearing earplugs around his neck. Sergeant Frazier analyzed the same photographs of defendant walking into Walmart and stated it appeared defendant had earplugs or headphones around his neck. Deputy Wassell acknowledged that it may be hard for a motorcyclist with earplugs to hear police sirens.

¶ 70        The physical characteristics of defendant's motorcycle along with defendant's manner of dress supported an inference that defendant could not hear the police sirens. Notably,

defendant's motorcycle did not have a rearview mirror, and the State provided no evidence that defendant ever turned around during the chase. Thus, the State's argument that the motorcycles traveled in a triangular formation and then moved to a single formation to elude police is not convincing where defendant maintained his position in the front and followed the requisite signage at the four-way intersection. Specifically, defendant made a complete stop at the stop sign. The evidence suggests defendant was unaware that police officers attempted to stop him where he eventually pulled ahead of the other motorcycles and proceeded to Walmart.

¶ 71 While the State argues defendant tried to hide his bike behind mulch at Walmart, the evidence does not show that defendant attempted to change or hide his appearance as he walked into Walmart. Rather, defendant parked his motorcycle and proceeded to go inside the store with his helmet and vest. Further, defendant told Sergeant Frazier he went to Walmart to buy "zip ties for something that came off his motorcycle." Deputy Wassell testified he observed a piece of plastic dragged from the bottom of defendant's motorcycle. Considering all the evidence presented, we find the trial court's denial of defendant's motion for a mistrial was not harmless beyond a reasonable doubt.

¶ 72 Although not raised by the State or the defendant, we further find the double-jeopardy clause does not preclude retrial in this matter because the evidence presented during trial was sufficient to sustain a conviction. See *People v. Drake*, 2019 IL 123734, ¶ 21, 131 N.E.3d 555. Here, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* Therefore, we reverse defendant's conviction and remand for a new trial.

¶ 73 III. CONCLUSION

¶ 74    For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 75    Reversed and remanded with directions.

¶ 76    JUSTICE TURNER, dissenting:

¶ 77    I respectfully dissent. Assuming *arguendo* the State improperly commented on defendant's postarrest silence, I would find the other evidence of defendant's guilt was overwhelming and thus agree with the State any error was harmless.

¶ 78    The other evidence at defendant's trial showed the initial encounter between Deputy Wassell and the motorcyclists, including defendant, occurred when they were approaching each other from opposite directions on U.S. 54. The deputy clocked the motorcycles going 78 mph in a 55-mph speed limit zone and activated his vehicle's emergency lights. Notably, Deputy Wassell pulled over on the right shoulder of the road and activated his emergency lights *before* defendant drove past the deputy's vehicle. Thus, defendant saw the flashing emergency lights, and the jury could infer defendant knew (1) he was traveling in excess of 20 mph over the speed limit, (2) the deputy activated his vehicle's emergency lights as a signal for defendant to pull over, and (3) the deputy drove his vehicle onto the shoulder of the roadway so he could make a U-turn to get behind the motorcycles. The fact Deputy Wassell did not turn his siren on when he turned on the emergency lights is irrelevant since the lights would have been visible to defendant.

¶ 79    After making the U-turn, Deputy Wassell turned on his siren and then proceeded to follow the motorcycles, now traveling at 60-65 mph, with his emergency lights activated and his siren blaring. The deputy was mostly following the motorcycles at a distance of around 200 to 300 feet. When the motorcycles came to a stop at a four-way-stop intersection, the deputy pulled up behind the motorcycles to within 10 to 15 feet. Although the deputy deactivated his siren at the

four-way-stop intersection, the emergency lights on his vehicle remained activated and flashing. When the motorcyclists pulled away, the deputy again engaged his siren. He continued to follow the motorcycles at 200 to 300 feet but at one point got within 100 feet.

¶ 80        Deputy Wassell next radioed for assistance, and Officer Hobbs responded by positioning her police vehicle in a driveway of Beard Implement. Her vehicle was perpendicular to U.S. 54 on the south side of the roadway and facing north "just a few" feet from the eastbound lane of traffic on U.S. 54. When she heard Deputy Wassell's siren, she activated her emergency lights, which also activated the video camera of her vehicle. The video shows it was around 50 seconds later that the motorcycles sped by her vehicle, a few feet away, coming from her left, heading eastbound, and paying no heed to her overhead emergency lights, which defendant would have seen in front of him from a substantial distance away. Once the motorcycles and Deputy Wassell's vehicle passed by her, Officer Hobbs turned right onto U.S. 54 and activated her own vehicle's siren. Then, with two police vehicles in pursuit, both with emergency lights activated and sirens blaring, the motorcycles completed a maneuver from the triangle formation to single file. With defendant in the lead, the motorcycles moved to the left-hand lane to pass a vehicle and increased their speed to over 90 mph in a 45-mph speed limit zone.

¶ 81        Having left Deputy Wassell far behind, defendant entered into Pittsfield and drove into the Walmart parking lot at a high rate of speed. A Walmart patron, Smith, was also in the parking lot and observed defendant drive his motorcycle to the back of Walmart where the loading docks were located before eventually parking his motorcycle behind piles of mulch. Because defendant appeared to be fleeing from a police vehicle on U.S. 54, Smith telephoned an off-duty police officer to report what he had observed and had his wife and kids get back into their vehicle because he did not want to be present if an altercation occurred.

¶ 82            Against this deluge of evidence, defendant focuses on a photograph taken of him as he entered the Walmart store. Depicted in the photograph is something hanging from defendant's neck. One witness could give no opinion on what the object was hanging from defendant's neck. Another witness believed it to be earplugs or headphones, and defendant emphatically argues the earplugs or headphones may have prevented him from hearing the blaring sirens. However, there are three problems with defendant's argument. First, no evidence was presented defendant was wearing earplugs or headphones while he was pursued by Deputy Wassell and/or Officer Hobbs. Second, no earplugs or headphones were found on defendant's person when he was placed under arrest or when he exited Walmart. Third, the statute under which defendant was charged (625 ILCS 5/11-204.1(a)(1) (West 2016)) does not even require officers to use a siren if their vehicle's emergency lights are engaged. See *People v. O'Malley*, 356 Ill. App. 3d 1038, 1043-44, 828 N.E.2d 376, 381-82 (2005).

¶ 83            Defendant also argues the State failed to prove he ever saw any emergency lights during the chase. Part of defendant's argument is his motorcycle had no mirror which would have allowed him to see behind him. This is a novel and creative defense. Section 12-502 of the Illinois Vehicle Code (625 ILCS 5/12-502 (West 2016)) requires vehicles, including motorcycles, to be equipped with a rearview mirror. Thus, in essence, defendant maintains his wilful violation of the Illinois Vehicle Code serves as a defense to fleeing and eluding. I further note that, while the jury lacked direct evidence defendant turned his head to watch Deputy Wassell complete his initial U-turn, the evidence shows the motorcycles slowed to 60 mph after Deputy Wassell started following them. Significantly, defendant's bike was in the lead and controlling the pace of the triangle formation. A reasonable inference is defendant slowed the pace because he knew the deputy was now pursuing him and his fellow motorcyclists.

¶ 84    Additionally, the evidence of defendant's front position and his stopping at the four-way-stop intersection does not suggest defendant was unaware the deputy was trying to stop him. While defendant stopped at the intersection, he then proceeded to disobey each and every speed limit sign and yellow caution sign during the remainder of his 13-mile flight. Moreover, presumably the rider of a crotch-rocket-style motorcycle would need to stop at such an intersection to avoid crashing into another vehicle which may be entering into the intersection. I also note the motorcyclists' formation began to change from a triangle to a single line as they approached Officer Hobbs's vehicle. Given Deputy Wassell's U-turn and pursuit of the motorcycles and the sight of another set of emergency lights, it is implausible the motorcyclists did not think Officer Hobbs was also in pursuit of them. Further, the evidence demonstrates defendant attempted to alter his appearance after attempting to hide his motorcycle. Defendant first apparently discarded his mask on the ground in the Walmart parking lot and later disposed of the item he wore around his neck after he entered the Walmart store. (As previously indicated, whatever item defendant wore was never found.)

¶ 85    Finally, in its brief on appeal, the State argues it "strains common sense" for defendant to claim he did not notice the police car behind him for *13 miles*. In oral argument, the State went further, asserting the defense's theory defendant did not know Deputy Wassell was initially behind him and later Deputy Wassell and Officer Hobbs were both behind him is "absurd" and "ridiculous." I note in *People v. Pena*, 170 Ill. App. 3d 347, 354-55, 524 N.E.2d 671, 676 (1988), a case cited by defendant, the court held where an officer followed the defendant for over a mile with lights and a siren activated, the jury could reasonably infer a wilful attempt to elude the officer. Based on the aforementioned evidence including the length of the pursuit, I would find any error was not only harmless beyond a reasonable doubt but was harmless beyond any and all

- 24 -

doubt. Accordingly, I would affirm the trial court's judgment.