**2023 IL 127223**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 127223)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
MICHAEL B. PINKETT, Appellee.

*Opinion filed June 2, 2023.*

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Cunningham, and
Rochford concurred in the judgment and opinion.

Justice Holder White took no part in the decision.

## OPINION

¶ 1    Defendant Michael B. Pinkett was detained in a Walmart bathroom, was
ordered to accompany a sheriff's deputy to the front of the store, and complied with
the deputy's orders to "not make a scene." At Pinkett's subsequent trial on criminal
and motor vehicle violations, the State commented on defendant's silence in its

opening statement, defendant sought a mistrial, and the Pike County circuit court denied his motion. Defendant was found guilty, and he appealed, arguing, in part, that the circuit court should have granted his motion for a mistrial. The appellate court agreed that defendant was entitled to a mistrial, finding that the circuit court erred in denying defendant's motion for a mistrial and reversed and remanded. 2021 IL App (4th) 190172-U. We affirm the judgment of the appellate court.

¶ 2                                    BACKGROUND

¶ 3        Defendant was charged with aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(1) (West 2016)), resulting from a June 2017 incident where he failed to stop his motorcycle in response to police sirens and lights and traveled more than 21 miles per hour over the speed limit. Additional charges of speeding[1] (*id.* § 11-601(b)) and failure to use a turn signal (*id.* § 11-804(d)) were added in July 2018.

¶ 4        At a preliminary hearing, Pike County Sheriff's Department deputy sheriff Brad Wassell testified to his 13-mile pursuit of three motorcycles at a high rate of speed in June 2017. On cross-examination, Wassell said he could not recall if defendant's motorcycle lacked rearview mirrors but, if defendant could not see behind him and did not turn around, it is possible defendant did not know Wassell was in pursuit. Wassell stated, if defendant was wearing earplugs, "[y]eah. I can see where that could have been difficult[ ]" to hear the siren, above the noise of the motorcycles and the wind. At the end of the hearing, the circuit court found probable cause existed.

¶ 5        A jury trial took place. Evidence presented at the trial established that defendant was ultimately arrested inside a Walmart based on his alleged act of fleeing and eluding a peace officer. Prior to opening statements, the trial court informed the jury that "[n]either opening statements nor closing arguments are evidence. And any statement or argument made by the attorneys which is not based on the evidence should be disregarded." In its opening statement, the State said that the arresting officers would "both testify in spite of the fact that they tried to arrest him

_____

[1]Defendant did not challenge the speeding conviction on appeal, the appellate court did not discuss it, and it is not an issue before this court.

there at Walmart without making a scene since it's in the middle of the store, at no point did he ever ask in any way the reason why he was being detained." Defense counsel objected, a sidebar took place, and defense counsel moved for a mistrial, arguing that it was improper to comment on defendant's right to remain silent. The State disagreed, arguing that a defendant's postarrest, pre-*Miranda* silence (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) is not constitutionally protected, citing *People v. Givens*, 135 Ill. App. 3d 810 (1985). Applying *Givens*, the trial court denied the mistrial motion.

¶ 6        Wassell testified he was on duty on June 10 in uniform in an unmarked sheriff's department vehicle. While on patrol traveling westbound outside of Pittsfield, he noticed three motorcycles riding eastbound in a triangular formation. The motorcycle at the front was a "crotch-rocket" style sport motorcycle, while the other two looked like Harley-Davidson models. The motorcycles appeared to be speeding. He activated his radar gun, which was calibrated and in working order, and clocked the motorcycles at 78 miles per hour (mph) in a 55-mph speed zone. He pulled onto the shoulder and activated the vehicle's lights, which included visor lights, a Wig-Wag system which alternates the headlights, side warning lights in the headlights, and blue and red lights in the grille.

¶ 7        After the motorcycles drove past him without stopping, he did a U-turn and began to pursue them. The motorcycles reduced their speed to 60 or 65 mph but did not stop. He turned on his siren and continued pursuit from approximately 200 feet behind them. They all arrived at a four-way stop in the town of Atlas, where Wassell pulled within 10 or 15 feet of the motorcycles and turned off his siren. He observed that the front motorcyclist wore a helmet and a large black knife sheathed at his waist. The motorcycle lacked rearview mirrors and had a piece of plastic dragging from its undercarriage and a darkened license plate. The passenger on one of the other motorcycles looked back at Wassell, who gestured for the motorcycle to pull over. It did not. All three motorcycles stopped before proceeding through the intersection. Wassell continued to pursue the motorcycles from 100 to 300 feet behind them.

¶ 8        As the pursuit neared Pittsfield, Wassell noticed Pittsfield police officer Lisa Hobbs sitting in her squad car in a commercial driveway off the side of the road. After they passed Hobbs, who had activated her emergency lights as the

motorcycles neared her location, the motorcycles disengaged from the triangle formation into a single file, sped up, and passed an SUV. At that point, Wassell was traveling at 90 mph in a 45-mph zone. He fell behind the motorcycles and lost sight of two of the motorcyclists, including defendant. He pursued the third motorcycle and ultimately arrested the driver at a gas station in Pittsfield where the motorcyclist had stopped.

¶ 9       Wassell identified, and the jury viewed, still pictures from Hobbs's squad car camera as the SUV and motorcycles passed her, Wassell's interview of defendant, and surveillance footage videos from Pike Feed and Walmart. He identified the three motorcycles and Hobbs passing Pike Feed in its video. In the Walmart video, he identified a motorcycle pulling into the lot and two motorcycles being pursued by two squad cars driving by on the road in front of the store. He also identified still photographs of the motorcycles shown in the Walmart video and pictures he had taken of two of the motorcycles, including defendant's.

¶ 10      On cross-examination, Wassell said defendant told him he did not see the deputy's lights because he was looking down when he initially passed Wassell. The motorcyclists did not split up or take other evasive actions. He followed the SUV for approximately a mile during the pursuit before it pulled off the road. Wassell acknowledged that defendant's motorcycle did not have rearview mirrors, he did not see defendant turn around at any time, defendant was wearing a helmet, and the motorcycles were louder than smaller motorcycles. He also stated that, if defendant was wearing a face mask that covered his ears, with the wind and motorcycle noise, it would be difficult to hear the siren.

¶ 11      Hobbs, who worked part-time as a Pittsfield police officer, testified. She was also a part-time officer for the Pleasant Hill Police Department and a full-time officer for the Pike County Sheriff's Department. She heard Wassell's request for assistance and positioned her car in the driveway of an implement dealership located on the road the motorcycles were travelling. Her squad car was perpendicular to the roadway. When she heard Wassell's siren, she turned on her MARS lights, which activated her dashboard camera. The video showed the motorcyclists driving by less than a minute later with Wassell a few seconds behind them. She joined the pursuit, and the video showed her squad car following Wassell into Pittsfield and into the gas station where he arrested one of the motorcyclists.

- 4 -

¶ 12        Hobbs was then dispatched to Walmart. On her way to the store, she stopped to pick up from the roadway a small leather item, which remained unidentified. When she arrived at Walmart, she noted a black motorcycle in the parking lot and found a black face mask on the ground. She waited while Sergeant Matt Frazier entered the store. On cross-examination, she examined a photograph of defendant entering Walmart, acknowledged there was an item hanging around defendant's neck but said she could not tell if it was earplugs or otherwise identify it.

¶ 13        Frank Smith testified. He was in the Walmart parking lot in Pittsfield with his family when defendant pulled in on his motorcycle and startled him. He estimated defendant's speed to be between 40 and 45 mph. The defendant drove around to the back of the store near the loading dock. Smith then heard sirens and "loud pipes going by" and saw two motorcycles drive by with two squad cars in pursuit. The other motorcycle emerged from behind the store and parked by the pallets of mulch. The driver entered the store carrying a shirt or jacket. Smith called his friend who was an Illinois State Police (ISP) officer and told him about the motorcyclist.

¶ 14        Smith said another motorcycle with a female passenger also pulled into the Walmart parking lot and went around the back of the building before backing into a spot next to the parking spot from which he was in the process of backing out. The passenger dismounted the motorcycle and began to walk toward the store entrance when she then turned around and remounted the motorcycle, which then left the parking lot. Smith further testified that he instructed his wife to place their child in the car so they could leave because he was fearful an incident might occur. However, he did not leave but pulled his vehicle into a corner of the parking lot to observe. He identified the motorcycles from the Walmart surveillance videos. Smith was excused as a witness but recalled the following morning to identify the defendant based on his encounter with him at Walmart. On cross-examination, Smith explained he was never interviewed by any law enforcement in connection with the case. He also said he saw defendant on the courthouse steps the prior day and recognized him from the Walmart parking lot.

¶ 15        Brian Douglas, an ISP officer, testified that Smith called him at home and informed him that the motorcyclist the police were chasing had parked his motorcycle by the mulch in the Walmart parking lot. He relayed the information to the dispatcher. On cross-examination, Douglas said Smith did not give a description

of the defendant or the motorcycle when he called but merely indicated they were at Walmart.

¶ 16    Matt Frazier, a sergeant with the Pike County Sheriff's Department, testified. He was Wassell's supervisor. Wassell called him and said he was in pursuit of three motorcyclists. Frazier was off duty and in a T-shirt and shorts when Wassell called him. He left home in anticipation of further police activity, saw one of the motorcycles pull into the gas station in Pittsfield, and followed him. He was then notified another one of the motorcyclists had entered the Pittsfield Walmart. Frazier responded to the Walmart parking lot, found the motorcycle by the mulch, and blocked it with his vehicle. He lacked handcuffs, a weapon, or any identification. He entered the store along with Paul Petty, the Pike County sheriff, who was also in plainclothes. Petty stayed at the front of the store, and employees directed Frazier to the men's bathroom in the back of the store.

¶ 17    Frazier found defendant at the sink in "biker attire" with a large knife at his side and said, "Hey, what's up?" Defendant appeared "somewhat nervous." As defendant left the bathroom, Frazier followed him, identified himself as a deputy sheriff, and said not to "make a scene." He explained: "at that time I just grabbed that knife from the sheaf [sic] that was on his side and pulled it out and I said, 'We need to walk out the store without making a scene,' and he did it with no problem." Frazier said that "[a]t some point" defendant told him why he was in Walmart, which was to buy zip ties "for something that had came off his motorcycle."

¶ 18    The following exchange took place:

"[STATE]: You talked about walking in from the bathroom to the front. Did he at that point, when you had detained him, ask why he was being detained?

[FRAZIER]: No, not like somebody going to your side and grabbing—in plain clothes grabbing a knife off your waistband and anything. He didn't act like I was doing anything out of line whatsoever which to me is odd."

Frazier said defendant made several comments, including asking how defendant could be certain Frazier was a peace officer and requesting identification. Frazier handcuffed defendant at the store's front doors with handcuffs he obtained from Petty. Defendant directed Frazier to the knife sheath, worried that the unsheathed

knife would cut someone. Defendant also told Petty to take his motorcycle to the police station so it would not be towed. At some point, defendant told Frazier he was at Walmart to buy zip ties to fix something on his bike and that he was not running from the police.

¶ 19    On cross-examination, defense counsel elicited testimony that defendant was an ideal arrestee because he complied with Frazier's orders to not make a scene and to keep his mouth shut. He agreed defendant had a right to remain silent and exercised his right by remaining silent. He did not infer any guilt from defendant's silence. Counsel also asked Frazier about an object around defendant's neck that was visible on the pictures showing him entering the store. According to Frazier, the object looked like earplugs or headphones. He admitted it was not unusual for someone to be washing their hands at the bathroom sink and the knife was not illegal. It was also not illegal for defendant to be in the store to purchase zip ties.

¶ 20    Petty, the Pike County sheriff and coroner, testified. He heard the radio reports about the pursuit and knew that a high-volume area was a good place to hide, so he headed to Walmart, checking the alleys along the route. He suspected the defendant was "generally trying to blend [in]." He met Frazier and Hobbs in the Walmart parking lot. Petty was wearing shorts or sweatpants and a T-shirt. After defendant was arrested, he drove defendant's motorcycle to the police garage with defendant's permission. It had a plastic piece dragging under it, which Petty had to pull up and hold. On cross-examination, Petty described defendant as cooperative, keeping his mouth shut as directed, and following the deputies' directions.

¶ 21    The State rested and the defense moved for a directed verdict, which the circuit court denied. The defense recalled Wassell and asked him, if defendant was wearing earplugs, his ears were covered with his face mask, the bikes were loud, and it was windy, whether it could be hard to hear the siren. Wassell responded that he could see it would be more difficult but that he was not the best person to answer the question. He acknowledged he answered the same question, "Yeah, it would be difficult," at the preliminary hearing. The State conducted redirect examination, and Wassell said his answer was the same; it could be difficult to hear.

¶ 22    The defense rested and renewed its motion for a directed verdict, which the court denied. Closing arguments took place. In its closing argument, the State said:

"[Defendant] doesn't ask why he's being detained. [Defense counsel] made a lot of arguments about [defendant] has a right to remain silent. Certainly, [defendant] has the right to remain silent, but, again, you just have to ask yourself what would a normal person who, if it's his argument 'it wasn't me, I had nothing to do with this,' what would that normal person do when someone comes up to you in the bathroom of Walmart, plain clothes—now, [Frazier] does say I'm a deputy sheriff—takes your knife and detains you? Don't you think a normal person would say what's this all about, why, why are you detaining me, what's going on? Just, that would be a normal response.

Again, [defendant] has the right to say nothing. But you have to ask yourself what would a normal person who had—if that's his argument—nothing to do with this, what would that normal person have said when they're suddenly detained in the bathroom of Walmart? If it's [defendant's] argument that he had nothing to do with it, surely you would ask what's going on."

¶ 23    The jury found defendant guilty of aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(1) (West 2016)) and speeding (*id.* § 11-601(b)) and not guilty of failure to use a turn signal (*id.* § 11-804(d)). The circuit court sentenced defendant to a two-year term of imprisonment.

¶ 24    Defendant appealed, and the appellate court reversed and remanded, finding that the circuit court erred when it denied defendant's motion for a mistrial. 2021 IL App (4th) 190172-U. The court held that, under Illinois evidentiary rules, evidence of the defendant's silence during and after an arrest is only admissible for impeachment purposes whether the silence occurs before or after *Miranda* warnings are given, that evidence of silence is not relevant to the question of guilt, that the State erred in eliciting evidence about defendant's silence, and that the error was not harmless. The dissent would have found that the error was harmless because there was overwhelming evidence of defendant's guilt. The appellate court did not reach the issue of prosecutorial misconduct based on the State's eliciting testimony regarding defendant's silence and commenting on it in closing argument. The State appealed, and this court granted its petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2020).

¶ 25                                           ANALYSIS

¶ 26          The issue for our resolution concerns the State's comments on defendant's silence in its opening statement. On appeal, the State argues the circuit court properly denied defendant's motion for a mistrial based on its comments in the State's opening statement and, if the court erred in denying the motion, the error was harmless. The State further argues that defendant's claim the State committed prosecutorial misconduct by eliciting testimony regarding his postarrest silence in its case-in-chief and by commenting on it in its closing argument is forfeited and does not constitute plain error. Like the appellate court, we do not reach the issue of prosecutorial misconduct. We find that the circuit court should have granted a mistrial, its error was not harmless, and the issue is dispositive.

¶ 27          As a preliminary matter, the parties do not dispute that defendant was under arrest when he was confronted by law enforcement, and there is no challenge before this court regarding his arrest. See *People v. Boston*, 2018 IL App (1st) 140369, ¶ 87 (" 'An arrest occurs when a person's freedom of movement is restrained by physical force or a show of authority.' " (quoting *People v. Surles*, 2011 IL App (1st) 100068, ¶ 23)). We further note that both parties presented constitutional arguments concerning defendant's right to remain silent in addition to relying on Illinois evidentiary law. We determine that the Illinois Rules of Evidence provide an adequate framework to decide the issue before us, and we thus determine it on the basis of Illinois evidentiary law. See *People v. Lee*, 214 Ill. 2d 476, 482 (2005) (courts should avoid constitutional issues where nonconstitutional basis for resolution exists).

¶ 28          Illinois Rule of Evidence 401 (eff. Jan. 1, 2011) defines " '[r]elevant evidence' " as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Illinois Rule of Evidence 402 (eff. Jan. 1, 2011) provides that only relevant evidence is admissible. Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) instructs that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 29     The State argues that its comments in its opening statement were not prohibited and a mistrial was not warranted. The State submits that, because of the unique circumstances of this case, defendant's silence was probative of consciousness of guilt and its probative value outweighed any possible prejudice from admission of the evidence under the balancing test set forth in Illinois Rule of Evidence 403 (eff. Jan. 1, 2011). Defendant maintains that the State violated his right to remain silent under Illinois evidentiary law, that postarrest, pre-*Miranda* silence is only admissible for impeachment purposes under Illinois's evidentiary framework, and that his silence was neither material nor relevant to his guilt. Defendant maintains that Rule of Evidence 401 provides a sufficient ground by itself to find the State's comments improper, that this court does not need to use Rule of Evidence 403, and that a mistrial was necessitated under Rule of Evidence 401.

¶ 30     We thus begin by examining Illinois Rule of Evidence 401 (eff. Jan. 1, 2011), which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Probability is tested in the light of logic, experience, and accepted assumption as to human behavior." *People v. Patterson*, 192 Ill. 2d 93, 115 (2000). Every piece of evidence must meet the threshold requirement of relevance. *People v. Dabbs*, 239 Ill. 2d 277, 289 (2010). Relevant evidence may be excluded where its probative value is outweighed by prejudice to the defendant. *Swift v. Schleicher*, 2017 IL App (2d) 170218, ¶ 78.

¶ 31     Under Illinois's evidentiary law, "[e]vidence of the defendant's postarrest silence is considered neither material nor relevant to proving or disproving the charged offense." *People v. Sanchez*, 392 Ill. App. 3d 1084, 1096 (2009). *Sanchez* is based on a line of cases beginning with *People v. Rothe*, 358 Ill. 52 (1934). In *Rothe*, this court determined that the admission of evidence that the defendant refused to make a statement at the police station was improper. *Id.* at 57. "In this refusal they were within their rights, and the fact that they refused to make a statement had no tendency to either prove or disprove the charge against them." *Id.* The court found the evidence "neither material nor relevant" and held it should have been excluded as prejudicial. *Id.* In *People v. Lewerenz*, 24 Ill. 2d 295, 299 (1962), this court again found that admission of evidence that "at the time of his arrest defendant had refused to make a statement on advice of counsel" was "prejudicial

error." Relying on *Rothe*, the court determined the evidence to be neither material nor relevant. *Id.*

¶ 32    Both *Rothe* and *Lewerenz* predate *Miranda* and are not based on its principles. Rather, both cases are founded on this state's recognition, as depicted in its rules and common law, that a defendant's silence in the face of adversarial interactions with law enforcement is not material or relevant to his guilt. In *People v. Clark*, 335 Ill. App. 3d 758, 763 (2002) (quoting *People v. McMullin*, 138 Ill. App. 3d 872, 876 (1985)), a post-*Miranda* case, the appellate court, relying on *Rothe* and *Lewerenz*, found that evidence of a defendant's postarrest silence is considered " 'neither material nor relevant' " to proving or disproving the charged offense. Although in that case the defendant was improperly impeached with evidence of his postarrest silence, the court found it impermissible to use the defendant's postarrest silence against him, whether the silence occurred before or after the defendant was Mirandized. *Id.* The court discussed that the prohibition was based on Illinois evidentiary law and not federal constitutional principles. *Id.* In *Sanchez*, the court similarly found that a defendant cannot be impeached with his postarrest silence, whether the silence occurred before or after the defendant was provided *Miranda* warnings, because the evidence was not material or relevant to the defendant's guilt. *Sanchez*, 392 Ill. App. 3d at 1096 (citing *Clark*, 335 Ill. App. 3d at 763).

¶ 33    In light of Illinois evidentiary law, we consider whether the circuit court erred in denying defendant's motion for a mistrial. A mistrial is proper "only if there is an occurrence of such character and magnitude as to deprive a party of a fair trial and that party demonstrates actual prejudice." *People v. Soto*, 2022 IL App (1st) 201208, ¶ 153. Where a motion for a mistrial has been denied, in addition to establishing prejudice, an appellant must also demonstrate that admonishments and curative instructions from the circuit court could not remedy the damage from the improper comments. *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 29. The circuit court's denial of a motion for mistrial will not be reversed unless it was an abuse of discretion. *People v. Bishop*, 218 Ill. 2d 232, 251 (2006).

¶ 34    In denying defendant's mistrial motion, the court relied on *Givens*, where the court analyzed whether the State's use of defendant's postarrest silence violated his rights against self-incrimination and his due process rights under the Illinois and

United States Constitutions. *Givens*, 135 Ill. App. 3d at 820. The *Givens* court did not consider the issue under the Illinois Rules of Evidence and is distinguished on that basis. We do, however, find its reasoning helpful. Looking to *Doyle v. Ohio*, 426 U.S. 610, 617-18 (1976), the *Givens* court discussed that pre-*Miranda* silence is " 'insolubly ambiguous' "; that is, it is unknown whether a defendant's silence is "nothing more than the exercise of the defendant's rights." *Givens*, 135 Ill. App. 3d at 820 (quoting *Doyle*, 426 U.S. at 617).

¶ 35        In its opening statement, the State commented that the officer wanted to arrest defendant "at Walmart without making a scene since it's in the middle of the store, [and] at no point did he ever ask in any way the reason why he was being detained." We consider defendant's silence to be "insolubly ambiguous," as he was ordered by Frazier to keep his mouth shut and not make a scene. Thus, whether his silence demonstrated an exercise of his rights or compliance with Frazier's orders is unknown but immaterial to the question of his guilt. Rather than acknowledge defendant's compliance with Frazier's orders, the State attempted to equate his silence with consciousness of guilt. However, under Illinois evidentiary law, defendant's silence was neither material nor relevant to the question of his guilt.

¶ 36        The appellate majority followed Illinois evidentiary law and found that it prohibited impeachment of a defendant with his postarrest silence whether the silence occurred before or after defendant was given *Miranda* warnings. 2021 IL App (4th) 190172-U, ¶ 53. Following the case law, the majority stated that " '[e]vidence of the defendant's [postarrest] silence is considered neither material [n]or relevant to proving or disproving the charged offense.' " *Id.* (quoting *Sanchez*, 392 Ill. App. 3d at 1096). The appellate court concluded that the circuit court abused its discretion in denying defendant's motion for a mistrial. *Id.* ¶ 54. It also determined that evidence regarding defendant's postarrest silence was improperly allowed and the State erred in commenting on it in opening statements, eliciting Frazier's testimony regarding it, and commenting on it during closing arguments. *Id.* We agree.

¶ 37        Contrary to the State's argument that the prosecutor's comments were proper under Illinois evidentiary rules, defendant's silence was not evidence of consciousness of guilt. This is especially true under the circumstances here, where Frazier ordered defendant to remain silent and not make a scene. The State used

- 12 -

defendant's silence to lead the jury to decide that, because an innocent person would have made an outcry upon being accosted by an unidentified person in plain clothes, defendant was not an innocent person. Equating his silence with guilt prejudiced him in that the improper comments suggested that defendant remained silent not because he was ordered to do so by Frazier but as a tacit admission that he committed the crimes for which Frazier was arresting him. Under the tacit admission rule, "[i]t must affirmatively appear that the defendant knew he was being asked about the crime for which he is on trial, for it is the assumption that one similarly situated would ordinarily deny the imputation of guilt which renders admissible defendant's failure to do so." *People v. Aughinbaugh*, 36 Ill. 2d 320, 323 (1967). The rule has no application under the instant facts, where defendant was not informed of the charges against him at the time of his arrest. In addition, although the circuit court admonished the jury before opening statements that they did not constitute evidence, we do not consider that general admonishment sufficient to remedy the damage from the State's improper commentary on defendant's silence. At the time the comments were made, the circuit court did not give a curative instruction. We find the State's comments in its opening statement violated defendant's right to remain silent and denied him a fair trial. The circuit court should have granted his request for a mistrial.

¶ 38    The State submits that, if the circuit court erred in denying defendant's mistrial motion, the error was harmless error in light of the overwhelming evidence against defendant, as the jury would not have acquitted defendant if the error had not occurred. The State further submits that any prejudice to defendant was mitigated by defense counsel's cross-examination of Frazier and its closing argument where it emphasized defendant had a right to remain silent.

¶ 39    An "evidentiary error is harmless 'where there is no *reasonable probability* that the jury would have acquitted the defendant absent the' error." (Emphasis in original.) *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (quoting *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990)). To prove defendant guilty of aggravated fleeing or attempting to elude a peace officer, the State had to establish that (1) a police officer in uniform indicated with hand, voice, siren, or lights that defendant should stop; (2) defendant willfully did not stop; and (3) while failing to stop, defendant drove at least 21 mph over the speed limit. 625 ILCS 5/11-204, 11-204.1(a)(1) (West 2016).

¶ 40     We thus consider whether there was any reasonable probability the jury would have acquitted defendant absent the State's error in its opening statement. To determine whether the error here was harmless, the appellate court, while distinguishing *Doyle* procedurally, used the factors it introduced to determine whether the error was harmless. 2021 IL App (4th) 190172-U, ¶ 58. The *Doyle* factors are

> " '(1) the party who elicited the testimony about the defendant's silence; (2) the intensity and frequency of the references to the defendant's silence; (3) the use that the prosecution made of the defendant's silence; (4) the trial court's opportunity to grant a mistrial motion or to give a curative jury instruction; and (5) the quantum of other evidence proving the defendant's guilt.' " *Id.* ¶ 57 (quoting *People v. Dameron*, 196 Ill. 2d 156, 164 (2001)).

Applying the *Doyle* factors, the majority found that the State did not carry its burden to prove the State's error was harmless. We agree.

¶ 41     The first factor concerns which party elicited the improper evidence. It was the State in its opening statement that referred to defendant's silence. The State's comments suggested that, had defendant been innocent, he would have verbally reacted to Frazier's actions. The reference inferred that defendant was anticipating an imminent arrest and was not surprised when it occurred.

¶ 42     The second factor considers the reference's intensity and frequency. Although the reference was brief, it implicated defendant's ability to obtain a fair trial. Because the improper reference to defendant's silence occurred during the State's opening, it flavored the entirety of the proceedings. Indeed, the State continued its improper commentary on defendant's silence in its case-in-chief and its closing argument.

¶ 43     The third factor examines the State's use of its reference to defendant's silence, which in this case was to present his silence as evidence of his guilt. The State recharacterizes its references to defendant's silence as drawing reasonable inferences from the evidence. According to the State, it may properly comment on the emotional tone of defendant's comments, his facial expressions, and his demeanor. See *People v. Davis*, 151 Ill. App. 3d 435, 441-42 (1986). The State's comments were not reflective of defendant's emotional tone, facial expressions, or

demeanor. The only testimony the State offered in this vein was Frazier's perception that defendant seemed nervous in the bathroom when Frazier initially greeted him. The State used the improper opening comments to bolster its theory that defendant's silence equated to consciousness of guilt.

¶ 44    Regarding the fourth factor, the circuit court had an opportunity to grant a mistrial but declined it, erroneously relying on *Givens* to do so because that case is procedurally distinguishable where the defendant took the stand and opened himself to impeachment. No curative instruction was provided after the State's comment on defendant's silence.

¶ 45    The fifth and final factor considers the quantum of other evidence proving defendant's guilt. In this case, as discussed below, the evidence proving defendant's guilt was not overwhelming. Under the majority's review of the evidence, it found the State failed to present overwhelming evidence of defendant's guilt and determined that a reasonable person could conclude that defendant did not know he was being pursued by police officers. 2021 IL App (4th) 190172-U, ¶ 67. The evidence supports its finding.

¶ 46    Wassell first observed the motorcyclists heading in the opposite direction, and he pulled off to the shoulder of the road and activated his emergency lights. The squad car was an unmarked vehicle with its lights embedded in the headlights, visors, and grille. His siren was not activated, but he turned it on after the motorcycles failed to stop. Hobbs's squad car was pulled off the road in the driveway of an implement dealer and perpendicular to the roadway. She turned on her lights and siren when she saw the vehicles approach but did not pull out into the road until after they passed her. The testimony of Frazier and Hobbs, Hobbs's dash cam video, and the surveillance video from Pike Feed establish that defendant was the lead motorcycle and the farthest away from the pursuing officers.

¶ 47    Smith testified the motorcycles he saw pass by on the road in front of Walmart had "loud pipes." Wassell testified the motorcycles were noisier than smaller motorcycles, that defendant's motorcycle lacked rearview mirrors, and that defendant was wearing a helmet and never turned around when Wassell was behind him. There is evidence defendant was wearing earplugs. Frazier and Hobbs testified that the still photographs of defendant entering the Walmart showed something hanging around his neck. Hobbs acknowledged she could see something around

- 15 -

defendant's neck but could not identify it. Frazier admitted the item around defendant's neck looked like earplugs or headphones. He admitted that, if defendant was wearing earplugs, a helmet, and a face mask that covered his ears, along with the sound of the wind and the motorcycles, it would be more difficult for defendant to hear his siren. Wassell also admitted that defendant told him he did not see the emergency lights on Wassell's car, as defendant looked down when he passed Wassell. There was no evidence defendant turned around and saw the squad cars. Wassell testified that only the passenger on one of the other bikes looked back while at the four-way stop. Wassell had turned off his siren at that point.

¶ 48      Defendant made a complete stop at a four-way stop despite the presence of Wassell behind him. The State surmises that defendant came to a complete stop at the four-way stop to avoid being hit going through the intersection. However, Wassell did not testify any other vehicles were present at or near the four-way stop. Wassell testified the only other vehicles he observed during the pursuit were Hobbs's squad car and the silver SUV, which did not initially pull over despite Wassell pursuing it for at least a mile with his vehicles lights and siren activated.

¶ 49      The State offered no proof that defendant or the other motorcyclists engaged in elusive behavior. The motorcyclists did not split up or turn around and go the opposite direction Wassell was travelling. They did not turn down any side roads to hide. As Petty testified, once in Pittsfield, there were alleys in which defendant could have attempted to hide. Instead, he parked his motorcycle in the Walmart parking lot and entered the store carrying his motorcycle attire. Defendant did not hide either his motorcycle or himself at Walmart, and his claim that he needed zip ties was supported by the fact that something was dragging from his motorcycle. Frazier and Petty all testified that something was dragging beneath defendant's motorcycle. Defendant's and the other motorcyclist's routes around the back of the Walmart before parking could be attributed to safety concerns, and the State's theory they were trying to hide from law enforcement is negated by the fact both motorcyclists eventually parked in the lot in the front of the store.

¶ 50      Like the appellate court, we do not find that the State presented overwhelming evidence of defendant's guilt to support a conclusion the circuit court's failure to grant a mistrial was harmless error. Wassell initiated the pursuit on defendant in an unmarked vehicle that was not equipped with a standard light bar on its roof. He

was positioned on the shoulder of the opposite side of the roadway from which defendant was traveling. Defendant said he looked down when he passed Wassell's vehicle and did not see the emergency lights. He was in the front of the motorcycle formation, his motorcycle lacked rearview mirrors, and arguably he could not hear the sirens. Although Wassell also signaled to pull over while at the Atlas four-way stop, there was no evidence defendant was aware of Wassell's signal. Defendant fully stopped at the intersection, another indicator that he did not willfully fail to stop. In our view, the evidence to support the willfulness component of the eluding statute was susceptible to differing conclusions.

¶ 51　　　　Because the evidence against defendant was not overwhelming such that the State's improper references to defendant's silence did not affect the verdict, we find the circuit court's error was not harmless. Application of the *Doyle* factors establishes that the State elicited the improper comments and referred to defendant's silence as indicative of his guilt and as dispositive of whether he committed the charged offenses, the circuit court declined its opportunity to grant a mistrial, and the evidence presented by the State against defendant was not overwhelming. The State's improper comments informed the jury that defendant was silent not as an exercise of his right to remain silent or as compliance with Frazier's orders but because he was guilty. Through its comments on defendant's silence, the State presented its theory that a "normal" person would have cried out and not remained silent had a stranger accosted him in the bathroom at Walmart. By making these comments in its opening statement, the State implied to the jury that defendant's silence amounted to guilt. We find that the circuit court erred in denying defendant's motion for a mistrial and affirm the appellate court's reversal of the denial of defendant's motion for a mistrial and its finding that the State improperly commented on defendant's postarrest silence.

¶ 52　　　　　　　　　　　　　　　　　　CONCLUSION

¶ 53　　　　Accordingly, for the foregoing reasons, we affirm the judgment of the appellate court, which reversed the judgment of the circuit court and remanded for a new trial.

¶ 54　　　　Appellate court judgment affirmed.

¶ 55  Circuit court judgment reversed.

¶ 56  Cause remanded.

¶ 57  JUSTICE HOLDER WHITE took no part in the consideration or decision of this case.