2024 IL App (4th) 220961

FILED
January 9, 2024
Carla Bender
4th District Appellate
Court, IL

NO. 4-22-0961

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Greene County |
| TANNER L. SCHOFIELD, | ) | No. 20CF77 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Allison Lorton, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1        In September 2020, defendant, Tanner Schofield, was charged with one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)), which was later amended to one count of aggravated criminal sexual abuse, a Class 2 felony (*id.* § 11-1.60(c)(1)). The State alleged that on or about August 13, 2020, defendant committed an act of sexual conduct by knowingly touching 10-year-old A.W.'s butt with his finger, underneath her clothing, for the purpose of his sexual gratification or arousal.

¶ 2        In June 2021, a jury found defendant guilty of aggravated criminal sexual abuse, and the trial court later sentenced him to 3 years' probation and 90 days in the county jail.

¶ 3        Defendant appeals, arguing that (1) the State did not provide sufficient evidence for the jury to find respondent guilty beyond a reasonable doubt, (2) the trial court deprived defendant of a fair trial by admitting other-crimes evidence for the purpose of propensity, and

(3) the court erred by failing to grant defendant's motion for a mistrial after a prospective juror made prejudicial comments in the presence of other prospective jurors during jury selection.

¶ 4    We disagree and affirm.

¶ 5                    I. BACKGROUND

¶ 6                    A. The Charges

¶ 7    In September 2020, defendant was charged with one count of predatory criminal sexual assault of a child (*id.* § 11-1.40(a)(1)). In January 2022, the State amended the charging instrument to instead allege one count of aggravated criminal sexual abuse, a Class 2 felony (*id.* § 11-1.60(c)(1)). The State alleged that on or about August 13, 2020, defendant touched 10-year-old A.W.'s butt with his finger, underneath her clothing, for the purpose of his sexual gratification or arousal.

¶ 8            B. The State's Motion To Admit Other-Crimes Evidence

¶ 9                    1. *The Motion*

¶ 10    In October 2020, the State filed a motion *in limine* to allow other-crimes evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2020)) to show defendant's propensity, intent, lack of mistake, and course of conduct in committing the offense. Specifically, the State sought to admit testimony that defendant grabbed A.W.'s buttocks over her clothes on a previous occasion.

¶ 11    Although the lead paragraph in the State's "motion *in limine* to allow other crimes evidence—same victim" stated that it was brought "pursuant to 725 ILCS 5/115-7.3," a later paragraph in that motion stated the following:

> "*In addition, said incident* is admissible to show ongoing relationship with
> defendant and there is a well-established [principle] in sexual offense cases that

- 2 -

evidence of a defendant's prior sexual activity with the same child *is admissible to show the defendant's intent*, design, course of conduct and to corroborate the victim's testimony." (Emphasis added.)

¶ 12    Defendant objected, arguing in his written response that (1) introduction of the other-crimes evidence would be unfairly prejudicial and (2) the "grabbing" did not qualify as an enumerated offense under section 115-7.3 of the Code (*id.*).

¶ 13                                         2. *The Motion Hearing*

¶ 14    In February 2021, the trial court conducted a hearing on the State's motion *in limine.* (We note that the court concurrently heard the State's motion to admit A.W.'s out-of-court statements pursuant to section 115-10 of the Code (*id.* § 115-10).

¶ 15    Hollie Davidson, an employee of the Unified Child Advocacy Network, testified that she conducted a forensic interview with A.W. on August 18, 2020, which was video and audio recorded. The State then played the video for the trial court. During that interview, Davidson asked A.W. if anything had happened like this before. A.W. replied, "No. Well, he touched my butt, he grabbed it, and he squeezed it for like a second, but then I thought—I just thought he was playing." A.W. did not state when that incident had occurred.

¶ 16    Following the parties' arguments, the trial court entered a written order granting the State's motion to admit other-crimes evidence. In doing so, the court referred to how the State had characterized its motion as brought under section 115-7.3. (The court also granted the State's motion to admit hearsay statements pursuant to section 115-10.)

¶ 17                                         C. Jury Selection

¶ 18    In June 2021, the trial court conducted defendant's jury trial. During *voir dire* the court called the prospective jurors to enter the courtroom in groups of 12. Each prospective juror

then answered questions regarding whether he or she could act as an impartial juror in this case. During *voir dire* of the second panel of prospective jurors, prospective juror Joe Montenez stated that he was a retired police officer from California and that he had "worked sexual assault and crimes against children for several years." He further stated that his experience as a police officer would "[a]bsolutely" keep him from being impartial, explaining as follows:

> "I would have a difficult time. *Most of the victims that I interviewed were assigned to the Sexual Assault-Children's Division and I found it very rare that a child would actually lie about being a victim or a potential victim.* Um, I had issues with being in that division and was asked, eventually, (inaudible) four years and went to the Narcotics Division. It became a heavy burden, especially I had young children at the time, but it was hard[.]" (Emphasis added.)

¶ 19     Defense counsel asked the trial court for a sidebar and, outside the hearing of the prospective jurors, moved for a mistrial, stating that he believed Montenez had "poisoned the jury pool as well as any jurors who are waiting in the gallery by his statements that he just made." Specifically, counsel contended that Montenez (1) "proffered himself as an expert witness for all [his] years in law enforcement" and (2) opined that child victims rarely lie.

¶ 20     The trial court denied counsel's motion for mistrial. Instead, the court stated that it would provide curative instructions to the prospective jurors. The court then instructed the prospective jurors as follows:

> "[B]ased upon Mr. Montenez's statements, I do want to just remind all of the jurors that one of your main jobs as a juror is that you *** are the one who's charged with determining how much weight to give anyone who testifies, whether it's a sheriff's deputy or whether it's a child. You will be, if you are selected, the

sole person to—responsible for determining whether or not you feel they're being honest and to give the appropriate weight to their testimony. Okay. Does anybody have any questions about that type of instruction? You understand what the court is asking you to do, that you are the sole—You're the sole fact-finders. You're the ones who will determine what happened in this case. Okay?"

¶ 21 After the trial court's admonitions, jury selection continued to a third panel of 12 prospective jurors. Ultimately, five of the selected jurors were from the second panel.

¶ 22 D. The Jury Trial

¶ 23 The following day, the State began its case-in-chief.

¶ 24 1. *A.W.*

¶ 25 A.W. testified that she was born in July 2010 and lived with her mother, Kari A., and stepfather, Nate A. She further testified that (1) her father was Kyle W. and (2) her paternal grandmother was Brenda S., who lived with her husband, Mark S., and her son, defendant.

¶ 26 A.W. stated that the last time she was at Brenda's house was after school on defendant's birthday. That day, defendant, Brenda, L.W. (A.W.'s younger sister), and A.W. watched a movie on the living room couch. At some point, "Brenda and [L.W.] took a shower," leaving A.W. alone with defendant on the couch. Once they were gone, defendant "pinched" her butt "like how you'd pinch your arm," which he had never done before. A.W. believed he was "just playing" and did not think anything of it.

¶ 27 While Brenda and L.W. were still showering, A.W. left the living room and went to the kitchen to make hash browns. While A.W. was seated on a stool in front of the air fryer, waiting for the hashbrowns to cook, defendant entered the kitchen and said, "Stand up." A.W. complied. Defendant then moved the stool, stood behind A.W., and put his right hand down the

- 5 -

back of her pants underneath her underwear.

¶ 28 When asked if defendant touched her on the outside of her butt cheeks, A.W. answered that his hand touched both outside and inside her butt cheeks and that part of his hand touched her "butthole." The whole incident lasted for a minute or less because L.W. came into the kitchen. When that happened, defendant took his hand out of her pants and went to his bedroom.

¶ 29 A.W. believed defendant's hand was on her butt for 60 seconds, but it could have been shorter. They were both silent as defendant's hand was on her butt.

¶ 30 Later, A.W. went to the living room and told Brenda that defendant had put his hand down her pants. A.W. did not say defendant touched her "butthole." Brenda said she would tell Kyle. They then went to supper.

¶ 31 After eating, A.W. and L.W. went with Kyle to the home of A.W.'s stepmother, Kayla. Before entering the house, Kyle asked A.W. if she could tell him what happened, and she told him about the incident with defendant.

¶ 32 After spending the weekend at Kyle and Kayla's house, Kyle returned A.W. to Kari's house. Once there, A.W. told Kari about the incident with defendant while Kari folded laundry. When Kari asked A.W. why she was telling her about the incident, A.W. replied that she told Kari so Kari could do something about it and prevent the same thing from happening to L.W. Nate happened to overhear the story and then asked A.W. to repeat to him what she told Kari, which she did.

¶ 33 Later, at the Child Advocacy Center (CAC), A.W. told Davidson that defendant put his hand on her butt and right around her "butthole." A.W. was not positive if his hand was on her anus or just around it. A.W. also told the prosecutor that she was not 100% sure if

defendant touched her anus. A.W. testified that defendant's finger never went inside her anus.

¶ 34　　　　　A.W. believed she told Davidson about defendant pinching A.W.'s butt in the living room prior to the kitchen incident; she was "pretty sure" she told the same story to the prosecutor and her mom.

¶ 35　　　　　　　　　　　　　　2. *Nate A.*

¶ 36　　　　　Nate A. testified that he was a police officer with the Greenfield Police Department, was married to Kari, and was A.W.'s stepfather. While he was getting ready for work on August 15, 2020, he overheard A.W. say that someone touched her, but he did not know who she was talking about. He "asked her to repeat what she said," and A.W. told him that defendant had touched her. However, he did not recall A.W. saying that defendant touched her "butthole." Nate called the Greene County Sheriff's Office to make a report. Nate did not speak about the incident again with A.W.

¶ 37　　　　　　　　　　　　　　3. *Kari A.*

¶ 38　　　　　Kari A. testified that she was A.W.'s mother. She said she had a good relationship with Brenda and Mark, who had been her in-laws. She never had any issues with defendant until August 2020 and had no reason to believe that defendant would ever touch A.W. in a sexual way.

¶ 39　　　　　Kari testified that on Thursday, August 13, 2020, she dropped A.W. off at Brenda's home to visit Kyle's side of the family, who were celebrating defendant's birthday. The following Saturday, August 15, 2020, Kari picked A.W. up from Kayla's house. When she got in the car, Kari noticed that A.W. seemed "a little bit quiet." Kari asked, "You okay?" and A.W. said, "[Y]eah I'm good." After arriving home at around 2 p.m., Kari began doing laundry, while Nate got ready for work. Five or 10 minutes later, A.W. came to Kari wanting to talk about the

incident. A.W. told Kari that defendant touched her butt. Kari testified as follows:

> "Um, so [A.W.] said that he put his hand in her shorts, and I said, um, 'Under my underwear'. And I said, 'Can you'—I said, '[A.W.], can you explain it to me how?'. And, so, she showed me like a cupping motion inside of her shorts and I said, 'Okay'. I said, I said, 'I—Under your underwear?'. And she said, 'Yes'.

> * * *

> *** I said, '[A.W.]'—I said, 'He touched where on your—on your butt? Or can you explain it'? And she said, 'He had his hand inside of my underwear and touched my butt'. And I said, 'Okay, where?'. And she said, 'He had his fingers down between my butt, mom'. And I said, 'Okay'. I said, '[A.W.], I need you to tell me'. She said, 'He touched my butthole, mom'. And I said, 'Okay, did he—did he just touch or'—And she said, 'Yes, just touched'."

¶ 40     Kari further testified that A.W. told her that defendant touched her from behind while she was making hash browns and stopped when L.W. came into the kitchen. Kari stated that Nate came out of the bathroom and asked what she and A.W. were talking about, at which time A.W. relayed to Nate that defendant had touched her butt. Nate called the Greene County Sheriff's Office. After the call, Kari continued speaking with A.W. to assure her that she "did the right thing" by reporting the incident to her. A.W. then asked Kari "to call [Kayla] so that Kayla would be made aware so she wouldn't send [L.W.] there again until it was investigated."

¶ 41     On Tuesday, August 18, 2020, Kari took A.W. to an interview at the CAC. Kari told A.W. that A.W. was going to talk to someone there about what had happened and she should tell the truth.

¶ 42                                      4. *Hollie Davidson*

¶ 43            Hollie Davidson testified that she interviewed A.W. at the CAC on August 18, 2020, which was video recorded and introduced into evidence. During the interview, A.W. told Davidson that five days earlier, on Thursday, she was in the kitchen cooking hash browns. Defendant came into the kitchen from his bedroom, and she thought he was there to help her. Defendant then walked behind her, told her to stand up, and put his hand on her butt under her underwear for around a minute. A.W. said defendant's finger was "right around [her] butthole." A.W. also told Davidson that sometime before the incident in the kitchen, defendant had squeezed her butt. However, she did not know any other details as to when that occurred.

¶ 44                                      5. *Austin Morrow*

¶ 45            Greene County sheriff's deputy Austin Morrow testified that he responded to Nate's call on August 15, 2020, and met with both Kari and Nate to gather information. He then contacted the Illinois Department of Children and Family Services to arrange for a forensic interview of A.W. at the CAC. He observed Davidson's interview with A.W. on August 18, 2020.

¶ 46            After the interview with A.W., Morrow asked defendant to come to the sheriff's office that same evening to talk to him about the allegations. Morrow's interview with defendant was audio and video recorded, and the recording was played for the jury.

¶ 47            On cross-examination, Morrow testified that at first defendant "said nothing happened as I recall that he just reached behind her with one hand and stopped in an attempt to stop her from bumping into a—a—cabinet or drawer, doorknob that was broken." Morrow testified that defendant's description of events changed throughout the interview. Morrow agreed that defendant was adamant he never intended for his hand to go into A.W.'s shorts. Morrow

agreed that defendant said several times that "if he had a sexual thought about a child, he would take a gun and kill himself."

¶ 48        Morrow agreed that defendant told him that when he left his room he saw A.W. using the air fryer and went to help her. Defendant poked A.W. with his right hand "and kind of tickled her to get to the hotplates." Morrow agreed that defendant told him A.W. moved towards "a sharp, broken cabinet handle" and he put his left hand behind her to protect her. Further, defendant told him that he did not initially realize that his hand had entered A.W.'s shorts. Morrow testified that defendant told him that he removed his hand from A.W.'s shorts 10 to 50 seconds later. Defendant never said that his hand touched A.W.'s anus.

¶ 49                            6. *Defendant*

¶ 50        Defendant testified that he did not touch A.W.'s butt on purpose or for sexual gratification.

¶ 51        Defendant testified that he went into the kitchen and saw A.W. cooking a hash brown in the air fryer while sitting on a stool. He decided to help her so that she would not burn herself and told her to stand up so he could retrieve oven mitts or a "counter protector" from a drawer in front of her. A.W. stood up, and defendant moved the stool and pulled out the oven mitt and "hotplate." Defendant stepped back to grab a spatula and playfully poked A.W.'s side, causing her to take a step back.

¶ 52        When asked what happened next, defendant responded as follows:

> "I—in the corner of the counter, there's two cabinets without—broken
> cabinet handles and they're old, broken metal so it's very sharp and pointy and
> I've gotten hurt on 'em myself in the past and I just instinctly [*sic*] reacted to stop
> her from—from backing into 'em. And she was slightly leaned forward, I'm

guessing her waistband came up off her back and 'cause where I am I quickly put my hand behind her[.]

* * *

And, uh, and, actually, it went into the back of her shorts and as soon as I got her stopped, I removed it. It was awkward silence, not sure what to do or say."

¶ 53 Defendant then left the room in silence because he felt embarrassed and awkward when he heard his mother exiting the bathroom. He testified that his hand entered A.W.'s pants "before or after the knuckles" and the whole interaction from the time he entered the kitchen until he left was about 30 seconds.

¶ 54 Defendant acknowledged that when his mother later asked him about the incident, he did not tell her everything that had happened. Defendant also acknowledged that he initially denied putting his hand down A.W.'s pants during the police interview with Morrow.

¶ 55 On cross-examination, defendant agreed that he might lie to get himself out of potential trouble. Defendant agreed that he lied to his mother, his father, and the officer who interviewed him about not touching A.W.'s butt.

¶ 56 E. *The Jury's Decision and Posttrial Proceedings*

¶ 57 Following closing arguments, the trial court instructed the jury, among other things, as follows: "Evidence has been received that the defendant has been involved in an offense other than that charged in the information. This evidence has been received on the issue of the defendant's intent and lack of mistake and may be considered by you only for that limited purpose."

¶ 58 The jury found defendant guilty of aggravated criminal sexual abuse. Defendant timely filed a motion for a new trial and a motion for judgment notwithstanding the verdict, both

- 11 -

of which the trial court denied. The court later sentenced defendant to probation for 3 years and 90 days in the county jail.

¶ 59       This appeal followed.

¶ 60                    II. ANALYSIS

¶ 61       Defendant appeals, arguing that (1) the State did not provide sufficient evidence for the jury to find respondent guilty beyond a reasonable doubt, (2) the trial court deprived defendant of a fair trial by admitting other-crimes evidence for the purpose of propensity, and (3) the court erred by failing to grant his motion for a mistrial after a prospective juror made prejudicial comments in the presence of other prospective jurors during *voir dire*.

¶ 62       We disagree and affirm.

¶ 63                    A. Sufficiency of the Evidence

¶ 64       Defendant argues that the evidence was insufficient for the jury to find him guilty of aggravated criminal sexual abuse beyond a reasonable doubt because the State did not present evidence of defendant's intent to touch A.W.'s butt. We disagree.

¶ 65              1. *The Applicable Law and Standard of Review*

¶ 66       The Illinois Supreme Court recently reiterated the familiar standard applicable to a defendant's challenge to the sufficiency of the evidence. In *People v. Jones*, 2023 IL 127810, ¶ 28, the court wrote the following:

> "In reviewing the sufficiency of the evidence in a criminal case, this court asks whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. A reviewing court will not substitute its judgment for that of the trier of fact on questions involving

the weight of the evidence or the credibility of witnesses. *Id.* All reasonable inferences from the evidence must be drawn in favor of the State. *Id.* A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.*"

¶ 67 "In weighing the evidence, a trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.* ¶ 32.

¶ 68 A person commits the crime of aggravated criminal sexual abuse if (1) he was 17 years old or older at the time of the alleged offense, (2) he knowingly touched or fondled any part of the victim's body, (3) he did so for the purpose of sexual gratification or arousal of himself or the victim, and (4) the victim was under 13 years old at the time. 720 ILCS 5/11-1.60(c)(1), 11-0.1 (West 2020).

¶ 69 "[A] defendant's mental state is ordinarily proved circumstantially by inferences reasonably drawn from the evidence. *** [Citation.] Intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense." (Internal quotation marks omitted.) *People v. Baker*, 2022 IL App (4th) 210713, ¶ 50. Further, "[a] defendant's intent to arouse or gratify himself sexually can be inferred solely from the nature of the act." *People v. Burton*, 399 Ill. App. 3d 809, 813, 927 N.E.2d 240 (2010).

¶ 70                                  2. *This Case*

¶ 71 Defendant argues that the State provided neither direct nor circumstantial evidence of defendant's touching A.W. for the purpose of sexual gratification. Defendant emphasizes that the record does not show that defendant (1) previously touched A.W. inappropriately, (2) threatened her or told her to keep the touching a secret, (3) said anything to

A.W. at the time of the incident, or (4) had an erection or pleasured himself after touching her. Accordingly, defendant asserts that all the reasonable inferences support his testimony that the touching was accidental. We disagree.

¶ 72    Defendant admits that his hand went into A.W.'s shorts and he told police officers that his hand was in her shorts for at least 10 seconds. A.W. testified that defendant had placed his hand in her shorts for longer than a few seconds and up to a minute. She also stated that his entire hand was under her underwear and that he touched her anus. Further, defendant said nothing to her after touching her inappropriately, giving no apology or explanation for his actions. Indeed, defendant testified that, because the situation was "awkward," he left the room in silence, just as he heard his mother exit the bathroom. Simply stated, defendant's story that he touched A.W.'s bare butt on accident as he tried to protect her from a sharp cabinet handle is hard to believe and was clearly rejected by the jury.

¶ 73    Viewing the evidence in the light most favorable to the State, the record shows that defendant put his hand down A.W.'s shorts and underpants for up to a minute, touching her anus, and then lied repeatedly to cover up his actions in an attempt to evade punishment. Defendant's lies to family and the police could fairly be viewed by the jury as his consciousness of guilt, which, when taken along with the surrounding circumstances of the incident and the improbability of defendant's explanation, provided sufficient evidence for the jury to find defendant guilty beyond a reasonable doubt.

¶ 74                    B. The Other-Crimes Evidence

¶ 75    Defendant next argues that the trial court erred by admitting other-crimes evidence of the prior "butt pinching" allegation. Specifically, defendant contends that the court improperly admitted the evidence as "propensity evidence" and did not follow the requirements

of section 115-7.3 before doing so.

¶ 76    We need not address whether the trial court properly followed the requirements of section 115-7.3 because the court did *not* admit that evidence on the issue of defendant's propensity to commit sex offenses. Instead, that evidence was admitted regarding defendant's intent and lack of mistake. That this other-crimes evidence was admitted only for these limited purposes and not as propensity evidence is shown by the instruction the court gave to the jury regarding this evidence: "Evidence has been received that the defendant has been involved in an offense other than that charged in the information. This evidence has been received on the issue of the defendant's intent and lack of mistake *and may be considered by you only for that limited purpose*." (Emphasis added.). We note that intent, lack of mistake, and continuing narrative are all proper bases for the admission of other-crimes evidence under the common law, aside from any question of the admissibility of that evidence under section 115-7.3.

¶ 77                              1. *The Applicable Law*

¶ 78    "The term 'other-crimes evidence' encompasses misconduct and criminal acts that occurred before or after the alleged charged conduct, including acts of misconduct for which the defendant was not charged or convicted." *People v. Adams*, 2023 IL App (2d) 220061, ¶ 67. Generally, other-crimes evidence is inadmissible to show a defendant's propensity to commit the charged offense. *People v. Watts*, 2022 IL App (4th) 210590, ¶ 39. However, other-crimes evidence may be admissible to demonstrate a defendant's "motive, intent, identity, absence of mistake, *modus operandi*, or any other relevant fact other than propensity." (Internal quotation marks omitted.) *Id.* "Indeed, other-crimes evidence is admissible to prove any material fact other than propensity that is relevant to the case." (Internal quotation marks omitted.) *Id.*

¶ 79    "This court has recognized that other-crimes evidence is admissible if it is part of

a continuing narrative of the event that gave rise to the offense." *People v. Johnson*, 368 Ill. App. 3d 1146, 1155, 859 N.E.2d 290, 299 (2006). Other-crimes evidence is also admissible under the continuing narrative exception when offered to explain an aspect of the crime charged or some of the conduct engaged in by the accused that would otherwise be implausible or perhaps even inexplicable. *People v. Carter*, 362 Ill. App. 3d 1180, 1190, 841 N.E.2d 1052, 1060 (2005).

¶ 80                                    2. *This Case*

¶ 81        Although the State's motion *in limine* did request the other-crimes evidence to be admitted pursuant to section 115-7.3 (725 ILCS 5/115-7.3 (West 2022)), that motion also asserted the other-crimes evidence was admissible to show defendant's intent. And the record is clear that the trial court did not admit that evidence to show defendant's propensity to commit aggravated criminal sexual abuse. Instead, it was admitted to show defendant's intent and absence of mistake.

¶ 82        We note that the State argued in closing that the evidence was offered for the purposes of proving defendant's (1) intent and (2) absence of mistake. As previously noted, the jury was likewise instructed that the evidence was admissible for only those two purposes. The instruction the jury received about the other-crimes evidence made no mention that it was admitted—or could be considered—for the purpose of proving defendant's propensity to commit sex offenses.

¶ 83        Section 115-7.3 is a statutory exception to the general rule against the admission of other crimes to show a defendant's propensity to commit the charged offense, allowing "the trial court to admit evidence of prior sex offenses to show a defendant's propensity to commit the sex crimes charged." *People v. Smart*, 2023 IL App (1st) 220427, ¶ 19. However, that statute does not abrogate the common-law rule that other-crimes evidence is admissible in a prosecution

for a sex offense or any other offense for any relevant purpose other than propensity. *Id.* ¶ 20.

¶ 84 Given that the State did not use the other-crimes evidence to prove defendant's propensity to commit sex offenses, it would have been helpful if the State's motion *in limine* made more clear that the common-law bases for the admissibility of that evidence were at least as important as the evidence's admissibility under section 115-7.3.

¶ 85 Even if the basis for the trial court's decision to admit the other-crimes evidence were not as clear as we think it is, we may affirm the trial court's judgment based on any basis in the record, regardless of the court's reasoning. *People v. Prather*, 2022 IL App (4th) 210609, ¶ 32. Here, the other-crimes evidence was admissible under the continuing narrative exception to show defendant's intent and absence of mistake because the State needed to provide context to the jury for the otherwise inexplicable act of defendant's putting his hand down A.W.'s pants in the kitchen.

¶ 86 A.W. testified that (1) defendant pinched her butt in the living room after L.W. went to shower and (2) put his hand down her pants just before L.W. finished showering. Because both incidents occurred while L.W. was showering, they must have happened in a relatively short time frame. Further, both incidents involved defendant's touching A.W.'s butt while they were alone. One touch could arguably be an accident, but two touches in relatively quick succession completely undermines any such notion and in this context was "part of a continuing narrative which concerns the circumstances attending the entire transaction." (Internal quotation marks omitted.) *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 58, 2 N.E.3d 642. Accordingly, the trial court did not abuse its discretion by admitting evidence of defendant's pinching A.W.'s butt prior to his later conduct of placing his hands down her pants and touching her anus.

¶ 87        C. The Prospective Juror's Statements

¶ 88   Last, defendant argues that the trial court should have granted his motion for mistrial because Montenez's volunteered statements during *voir dire* tainted the jury pool. We disagree.

¶ 89       1. *The Applicable Law and Standard of Review*

¶ 90   "A mistrial is proper only if there is an occurrence of such character and magnitude as to deprive a party of a fair trial and that party demonstrates actual prejudice." (Internal quotation marks removed.) *People v. Pinkett*, 2023 IL 127223, ¶ 33. Additionally, a defendant must show that "admonishments and curative instructions from the [trial] court could not remedy the damage from the improper comments." *Id.*

¶ 91   We review a trial court's denial of a motion for mistrial for abuse of discretion. *Id.*

¶ 92          2. *This Case*

¶ 93   Here, because defendant cannot establish that he was prejudiced by Montenez's volunteered statements during *voir dire*, we conclude that the trial court did not abuse its discretion by denying his motion for mistrial.

¶ 94   Montenez's most problematic statement was as follows: "Most of the victims that I interviewed were assigned to the Sexual Assault-Children's Division and I found it very rare that a child would actually lie about being a victim or a potential victim." Based primarily on that statement, defendant argues that Montenez operated as a *de facto* expert in sex crimes against children and rendered an opinion on children's honesty that irredeemably tainted the jury, prejudicing him. We disagree.

¶ 95   Although defendant is correct that Montenez's statement, when taken along with

his statements regarding his standing in the community and his years of police experience, might have the potential to lead the jury to give greater weight to A.W.'s testimony when she described how defendant touched her, whether defendant touched A.W.'s buttocks was not a contested issue in this case. That is because defendant admitted as much but claimed his doing so was accidental and inadvertent.

¶ 96 At his trial, defendant denied that he placed his hand down A.W.'s shorts for the purpose of sexual gratification and asserted instead that his placing his hands down A.W.'s shorts was an accident. Accordingly, this case did not turn on *A.W.'s credibility* but on *defendant's credibility* about why he put his hand down A.W.'s shorts. Because A.W.'s testimony that defendant touched her butt was uncontroverted and had no bearing on defendant's mental state, defendant cannot demonstrate prejudice based on Montenez's statements. Accordingly, he fails to demonstrate that the trial court erred by denying his motion for a mistrial.

¶ 97 III. CONCLUSION

¶ 98 For the reasons stated, we affirm the trial court's judgment.

¶ 99 Affirmed.

---

*People v. Schofield*, 2024 IL App (4th) 220961

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Greene County, No. 20-CF-77; the Hon. Allison Lorton, Judge, presiding. |
| **Attorneys for Appellant:** | Paige Clark Strawn, of Law Office of Paige Clark Strawn, P.C., of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | Caleb Briscoe, State's Attorney, of Carrollton (Patrick Delfino, David J. Robinson, and Matthew S. Goldman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |