NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241043-U

NO. 4-24-1043

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 29, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| RICKEY J. PAYNE, | ) | No. 22CF858 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Zenoff and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, concluding (1) defendant was not denied effective assistance of counsel because he could not show he was prejudiced by any deficient performance by his defense counsel in not objecting to defendant's statements in an interrogation video and (2) the trial court did not abuse its discretion in denying defendant's motion for a mistrial although an inadmissible image was briefly and inadvertently displayed to the jury.

¶ 2     Defendant, Rickey J. Payne, was charged with first degree murder for the shooting deaths of his wife, Quardreka Payne, and her son, C.T. After a jury trial, defendant was found guilty of both murders, and the trial court sentenced him to life in prison. Defendant appealed, arguing: (1) he was denied his right to effective assistance of counsel when his defense attorney failed to object to portions of defendant's interrogation videos that were admitted as evidence and (2) the court erred when it denied defendant's motion for a mistrial after the State inadvertently displayed an image that was barred by an order *in limine*. We conclude defense

counsel was deficient for failing to object to some statements, but defendant failed to show he was prejudiced by those deficiencies, so defendant cannot prevail on a claim of ineffective assistance of counsel. We also conclude the court did not abuse its discretion in denying defendant's motion for a mistrial. Thus, we affirm defendant's convictions.

¶ 3                                          I. BACKGROUND

¶ 4          Defendant was charged by information, and later indictment, with six counts of first degree murder for the shooting deaths of Quardreka and C.T. which occurred on or about September 29, 2022. The State proceeded to trial on two of the six counts (counts III and VI), both alleging first degree murder under section 9-1(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(2) (West 2022)). Count III alleged defendant committed first degree murder in that he knowingly and without justification personally discharged a firearm and shot Quardreka, knowing the acts created a strong probability of death or great bodily harm, and caused the death of Quardreka. Count VI alleged the same acts against C.T. but added the allegation that C.T. was under the age of 12 years at the time of the murder. The remaining counts were dismissed by the State.

¶ 5                                     A. Pretrial Motion *in Limine*

¶ 6          Prior to trial, defense counsel made an oral motion *in limine* to bar some text messages exchanged in May 2022 between defendant and Quardreka, including two images of defendant holding what appeared to be an assault weapon. With respect to the images, defense counsel argued they were more prejudicial than probative and admission of the images would deny defendant a fair trial. Also, the images did not depict the gun used in the crime, so defense counsel argued they could be construed as portraying defendant committing a prior bad act or prior crime, in that assault weapons were banned in Illinois. Defense counsel also argued the text

message exchange was prejudicial and too remote in time. The State agreed not to present the text messages sent by Quardreka but argued the remaining text messages and the images, which were sent by defendant, all contained threats against Quadreka and were admissible as direct evidence of defendant's intent and state of mind as to the crime charged. Further, since this case involved the murder of defendant's spouse, the text messages and the images were admissible to show defendant's prior threats of domestic violence. The trial court found the text messages were relevant and the prejudicial effect did not outweigh the probative value. However, the court concluded the relevance of the images was substantially outweighed by the danger of confusing the issues and misleading the jury. The court denied the motion as to the text messages but granted the motion *in limine* as to the two images.

¶ 7                                              B. Jury Trial

¶ 8            Eric Hall testified Quardreka was his sister. Quardreka moved to Peoria, Illinois, in 2022, with C.T. and her twin daughters, the latter two she shared with defendant. Defendant initially remained in Mississippi, but he arrived in Peoria in September 2022 and lived with Quardreka and the children. Before defendant arrived, Quardreka gave Hall her gun for safekeeping, and Hall claimed he still had possession of that gun. Hall observed defendant with a handgun in September 2022 when the handgun fell out of defendant's bag. It was a silver gun with black trim, which Hall identified as a "57" Magnum. However, Hall also identified it as consistent with the gun found by a crime scene investigator in the backyard of Quardreka's residence. Hall's wife, Nichole Jackson, testified C.T.'s date of birth was December 11, 2013, making him eight years old at the time of his death.

¶ 9            Drake Hart, a deputy sheriff with the Peoria County Sheriff's Office, testified he responded to Quardreka's residence at approximately 8:15 a.m. on September 29, 2022. Deputy

Hart identified the audio and visual recording of his body-worn camera as an accurate recording of his interaction with defendant that morning. The recording was published to the jury. In the recording, defendant states he left the residence a few hours earlier without keys, and he returned to find the door locked and a back window broken. Quardreka was not answering the door or her cell phone. Defendant led Deputy Hart and another officer around the outside of the residence, showing them where a security camera was missing and where a back window was broken. Deputy Hart, along with the other officer, eventually decided to forcibly break in through the front door and enter the residence. Quardreka was deceased, lying in blood just inside the front door. Upon seeing Quardreka, defendant dropped to the ground and began loudly crying. Deputy Hart and the other officer proceeded to search the home for the three children, finding them in an upstairs bedroom. C.T. was lying on the floor, on his sleeping bag, deceased. The twin girls, who appeared uninjured, were in a playpen next to C.T. The officers picked up the twins and carried them outside.

¶ 10          Matthew Kaufman, a crime scene investigator with the Peoria County Sheriff's Office, testified he was dispatched to the residence at approximately 9 a.m. on September 29, 2022. Deputy Kaufman surveyed the exterior of the residence and located a fence line to the right of the house. At the back corner of the yard, there was a jog in the fence line and a tree stump in the corner. Behind the tree stump, in the space between the tree stump and the fence, Deputy Kaufman located a silver and black handgun, some cigarette or cannabis rolling papers, and a small bag of raw cannabis. Deputy Kaufman identified the handgun as a silver and black Taurus 9-millimeter pistol with three rounds in the magazine. Deputy Kaufman had the items photographed and then removed and documented the items. In the same area, Deputy Kaufman observed a white plastic grocery bag stuck in some branches about three or four feet off the

ground. He found a library card belonging to C.T. inside the bag.

¶ 11　　　　Inside the residence, Deputy Kaufman located a bullet defect in the wall near the front door and recovered a projectile from inside the wall. In the upstairs bedroom, where C.T.'s body was found, Deputy Kaufman found two holes in the floor and recovered one projectile from the crevice between the subfloor and the lower floor ceiling. The other projectile had continued through the first floor ceiling, and it was recovered in a bedroom on the main floor.

¶ 12　　　　After returning to the sheriff's office, Deputy Kaufman collected defendant's clothing for evidence. He also performed a gunshot residue test on defendant's hands, although it was never sent for testing. The silver and black handgun was submitted to the state police crime lab for fingerprint testing.

¶ 13　　　　Michael Bridson, a crime scene investigator with the Peoria County Sheriff's Office, testified he observed and photographed a broken window in the back of the residence. Deputy Bridson thought the window looked odd, particularly because there was glass all over the ground outside, which did not match defendant's report that someone had broken into the residence. There was also a large shard of glass remaining in the frame, which would have been dislodged if a person had gone through the window. Deputy Bridson identified a photograph of the back window, taken from the inside of the residence. He did not observe any glass on the floor inside the residence.

¶ 14　　　　Deputy Bridson identified a bullet jacket fragment found on the floor close to Quardreka's body. Upstairs in a bedroom, Deputy Bridson observed C.T. on the floor with two gunshot wounds to the right side of his head. Beneath C.T., Deputy Bridson located two bullet holes in the floor. Deputy Bridson further searched the bedroom where C.T.'s body was found and located an empty gun case in the closet. The gun case did not contain a gun but it did contain

9-millimeter ammunition, which was the same ammunition as used for the handgun found in the yard. Deputy Bridson testified the handgun found in the yard was a semi-automatic pistol that ejected shell casings, but there were no shell casings found at the scene. He examined defendant's clothes and did not notice any blood spatter.

¶ 15        Andrew Fuller, a patrol officer with the Peoria Police Department, testified he took a report from Quardreka on May 6, 2022, relating to problems she was having with defendant. Officer Fuller identified several text messages Quardreka showed him that day, reportedly from defendant, threatening her. Officer Fuller also listened to a recording Quardreka had made of a conversation between her and defendant wherein defendant made threatening remarks to her. Quardreka reported defendant was in Mississippi, so Officer Fuller did not take any action at that time.

¶ 16        Meredith Budde, a latent print examiner with the Illinois State Police, testified she found two latent fingerprints on the handgun recovered at the scene: one on the side of the handgun's slide and one on the ammunition magazine. Both prints were suitable for comparison and were a match to defendant.

¶ 17        Nicole Fundell, a forensic scientist with the Illinois State Police, specializing in firearms examination and identification, identified the handgun in evidence as a Taurus 9-millimeter Luger firearm. After testing the gun, Fundell determined the bullet, or projectile, recovered from the wall near Quardreka's body was fired from that gun. Fundell also determined the bullet jacket fragment found on the living room floor near Quardreka's body was fired from the same gun. The bullet recovered from under the upstairs bedroom floor and the bullet recovered in the first floor bedroom were both fired from the same gun.

¶ 18        Dr. Amanda Youmans, a physician who specializes in forensic pathology,

testified she conducted the autopsies on Quardreka and C.T. Quardreka had three separate blunt force injuries to her face that occurred around the time of her death. She had a laceration to her right cheek, a laceration on the left side of her nose under which her nose was broken, and a laceration to her lower lip. Quardreka had a gunshot wound with the entrance on her right cheek, near her right ear, exiting through her left eye. Dr. Youmans opined Quardreka was shot from behind, but on her right side. Quardreka had a second bullet wound in her neck. A third bullet wound entered in her right shoulder, with a similar trajectory, right to left and upward. There was no stippling around any of the wounds, so Dr. Youmans opined the gunshots came from more than two feet away. Dr. Youmans opined Quardreka's cause of death was the multiple gunshot wounds.

¶ 19 Dr. Youmans also conducted the autopsy on C.T. He had two gunshot wounds to the head, both to the right temporal region. Stippling of the wounds indicated C.T. was shot at close range. Dr. Youmans opined C.T.'s cause of death was the gunshot wounds to his head.

¶ 20 After Dr. Youmans's testimony, defense counsel asked the trial court to declare a mistrial on the basis that one of the text message images, which was barred by the pretrial order *in limine*, appeared on the screen during Dr. Youmans's testimony. The image showed defendant holding an assault weapon, and defendant estimated it was on the screen for 10 seconds. The State acknowledged the image inadvertently appeared on the screen, but only for approximately two seconds, and explained the barred image was in the background on the State's discovery application. The State immediately closed the application upon seeing the image on the screen. Defense counsel agreed the image was shown inadvertently. The trial judge acknowledged he saw the image, too, and it was on the large screen for approximately two seconds. The trial judge denied the motion for a mistrial and proposed two remedies for defense counsel and defendant to

consider: (1) instruct the members of the jury to disregard anything they may have seen or (2) not address the issue and draw attention to it. Given those two options, defense counsel opted to not address the issue, but the issue could be re-addressed at the jury instruction conference.

¶ 21　　　　The trial continued and Benjamin Johnston, a detective lieutenant with the Peoria County Sheriff's Office, testified he and another detective interviewed defendant at the police station on the morning of September 29, 2022. Lieutenant Johnston identified the video recording of defendant's interview as being separated into four parts, with segments where defendant was alone in the room redacted for efficiency. Defense counsel did not object to the admission of the four recordings being admitted into evidence.

¶ 22　　　　The four video recordings were played for the jury. During his recorded interview, defendant initially told the detectives he was home the previous evening with Quardreka, their twin daughters, and C.T., and it was a normal day. He had been in Peoria for about a week, but the five of them had been in Mississippi together the prior week. Defendant claimed he left the residence and went to a gas station at around 5 a.m. and a neighbor dropped him off down the street at around 5:20 a.m. Defendant hung out on the porch of the residence, smoked some cannabis, and then left the residence again to make a cannabis sale, returning at around 6 a.m. Defendant tried to enter the residence, but the door was locked and Quardreka did not answer her phone. Defendant was worried because some men had tried to rob him at the liquor store recently. Defendant called Bell, because Bell had a key to the house, but Bell was not available. Defendant then called the police. Defendant stated he used to have a black Glock 9-millimeter handgun, but he sold it a week earlier. Defendant also stated he had an assault weapon, but he sold it in Mississippi a few months earlier.

¶ 23　　　　Upon further questioning, defendant added, after the family returned from

Mississippi, defendant drove to Springfield, Illinois, and obtained a silver or chrome gun from his cousin. Defendant stated he drove back to Springfield the same night to return the gun, and he had not had access to any guns since that night. Defendant admitted he and Quardreka were arguing in the early morning of September 29 over text messages received by Quardreka, but the argument was not physical. Defendant identified a video he had taken of himself scrolling through Quardreka's messages on her Apple watch. Defendant told the detectives he left the residence and started to drive to Iowa, but he turned back and returned to the residence.

¶ 24    As the interview progressed, defendant's recount of the events changed again. Defendant stated he and Quardreka were arguing, and Quardreka retrieved her gun from its locked case and pointed it at him. Defendant left the residence.

¶ 25    Upon further questioning, defendant admitted "it just happened" and explained Quardreka blocked him when he tried to leave the residence. When Quardreka said she was going to put her gun away, defendant took his gun, the silver gun recovered by police at the residence, out of his bag and set it on the couch next to him so Quardreka would see it. Quardreka picked up defendant's gun and cocked the hammer back. Defendant overpowered her and took the gun. They wrestled over the gun, and Quardreka's face was injured. According to defendant, they were in the kitchen when the gun went off. He was not sure if Quardreka was shot in the face or if she was injured while they were fighting. Quardreka went around the corner toward the front door and then came back toward defendant and he shot at her, possibly twice. Quardreka fell to the ground. After defendant shot Quardreka, C.T. came down and asked what was happening. Defendant told C.T. to go back upstairs and lie down. Defendant also went upstairs, pointed the gun at C.T., and shot C.T. at least twice with the same gun defendant used to shoot Quardreka. There were no shell casings at the scene because the gun had a

brass-catching device attached to it, and defendant disposed of the device and the shell casings in the woods near the residence.

¶ 26　　　　After the video recordings were played for the jury, Lieutenant Johnston testified he looked for the shell casings at the location identified by defendant, with defendant's assistance, but he never located the shell casings. Lieutenant Johnston also identified two video clips that were obtained from defendant's cell phone, both were videos defendant took of Quardreka's Apple watch in the early morning hours of September 29, 2022. The videos show defendant scrolling through Quardreka's text messages. Those videos were played for the jury without objection. Johnston could not verify defendant's statement that he sent some messages from Quardreka's phone because the police never gained access to Quardreka's phone.

¶ 27　　　　The defense did not present any evidence. Defense counsel renewed his motion for a mistrial on the basis the jury saw the image with defendant holding the assault weapon. The trial court again denied the motion, noting the showing of the image was inadvertent, with no context or description, and there was no indication if or how many jurors saw the image. Notably, the parties could not agree on which of the two images appeared on the screen; defense counsel thought it was one image and the prosecutor and the judge thought it was the other.

¶ 28　　　　The jury found defendant guilty of first degree murder of both Quardreka and C.T. and found defendant personally discharged the firearm that caused their deaths. Defense counsel filed a motion for a judgment notwithstanding the verdict or, alternatively, a new trial. The motion was denied and the matter proceeded directly to sentencing. The trial court sentenced defendant to natural life in prison.

¶ 29　　　　Defendant appealed.

¶ 30　　　　　　　　　　　　　　II. ANALYSIS

¶ 31     Defendant raises two issues on appeal. First, defendant contends he was denied his right to effective assistance of counsel because his defense attorney failed to object to portions of the interrogation videos that contained inadmissible and prejudicial evidence. Second, defendant contends the trial court erred when it denied defendant's motion for a mistrial after the State displayed an inadmissible and prejudicial image of defendant holding an assault weapon.

¶ 32                              A. Interrogation Videos

¶ 33     Defendant contends his defense counsel was ineffective for failing to object to portions of the four interrogation videos that were played for the jury. Defendant argues his counsel was deficient for failing to move to redact irrelevant and unduly prejudicial statements made by the officers and defendant during the interrogation. Specifically, defendant challenges: (1) statements effectively admitting other crimes and (2) statements about defendant's older daughter and her mother. Defendant contends, if the challenged statements had been redacted, there is a reasonable probability the result of the trial would have been different.

¶ 34     The State contends there was no error and defense counsel's actions amounted to reasonable representation. The entire interrogation was admissible to show defendant's demeanor throughout and to give context to his confession. In addition, the statements were relevant. While there might have been some prejudice, it would not have substantially outweighed the probative value in light of defendant's trial strategy. The State argues further, even if his attorney was deficient, defendant cannot show prejudice because all the comments were brief, but, more importantly, the evidence of defendant's guilt was overwhelming.

¶ 35     A criminal defendant is constitutionally guaranteed the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. art. I, § 8; *Strickland v.*

*Washington*, 466 U.S. 668, 684-686 (1984). "To prevail on an ineffectiveness claim, 'a defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced defendant such that he was deprived of a fair trial.' " *People v. Brown*, 2024 IL 129585, ¶ 27 (quoting *People v. Cross*, 2022 IL 127907, ¶ 19). The ultimate question of whether a defendant received ineffective assistance of counsel is a question of law we review *de novo*. *People v. Johnson*, 2021 IL 126291, ¶ 52.

¶ 36 To show counsel was deficient, a defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688. " 'Effective assistance of counsel refers to competent, not perfect representation.' " *People v. Evans*, 209 Ill. 2d 194, 220 (2004) (quoting *People v. Stewart*, 104 Ill.2d 463, 491-92 (1984)).

¶ 37                                  1. *Other Crimes Evidence*

¶ 38 Defendant contends the statements in the interrogation videos where he effectively admitted to other crimes were not only irrelevant to the charged crimes, but they were also prejudicial, so defense counsel was deficient for not objecting and moving to redact those statements. The statements related to other-crimes evidence defendant challenges are: (1) defendant's affirmative response he was a felon and (2) defendant's admissions he previously possessed and sold two firearms, a black "Glock 9" and an assault weapon, neither of which was the murder weapon in this case.

¶ 39 The State contends the statements were all admissible because they were relevant in terms of the defense presented. Even if the statements were inadmissible, defense counsel's representation of defendant was reasonable because the failure to object could be considered trial strategy.

¶ 40 Evidence is only admissible at trial if it is relevant. *People v. Pinkett*, 2023 IL

127223, ¶ 30 ("Every piece of evidence must meet the threshold requirement of relevance"); Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant when it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Even if relevant, evidence may be excluded for various reasons, including when the probative value is substantially outweighed by the prejudicial effect. Ill. R. Evid. 403 (eff. Jan. 1, 2011). Evidence of other crimes is not admissible to prove a defendant's propensity to commit crimes, but it may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Pikes*, 2013 IL 115171, ¶ 11.

¶ 41 Defendant contends the statements wherein he admitted he was a felon and had possessed and sold two firearms in Mississippi did not meet the threshold test of relevance. In order to prove defendant guilty of first degree murder under section 9-1(a)(2) of the Code, the State had to prove defendant killed Quardreka and C.T. without lawful justification, knowing his acts that caused their deaths created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 2022). Defendant argues the statements amounted to admissions of other crimes, which did not prove any of the required elements. The State contends defendant's admissions to being a felon and to possessing other firearms were relevant evidence of consciousness of guilt because it showed defendant's demeanor, particularly when contrasting those admissions to defendant's obfuscation in other parts of the interrogation.

¶ 42 Evidence of other crimes to show a defendant's propensity to commit crimes arguably has some probative value. *Pikes*, 2013 IL 115171, ¶ 16. However, such evidence is inadmissible, absent an exception, because "it may overpersuade the jury, which might convict

the accused because it believes he or she is a bad person." *Id.* In this case, defendant's admission that he was a felon was not necessary to prove any of the required elements of first degree murder and was likely inadmissible because it carried a high risk of overpersuading the jury defendant was a bad person. The same can be said of defendant's admission that he possessed and sold an assault weapon. On the other hand, the State argues defendant's admission to possessing and selling the Glock was relevant to explain why defendant was not in possession of the gun observed by Hall. We agree that admission was relevant for this purpose. We also note defendant did not testify in his own defense, so the evidence of other crimes could not have been considered admissible for impeachment purposes. See *People v. Montgomery*, 47 Ill. 2d at 516 (evidence of prior conviction is admissible for impeachment under certain conditions).

¶ 43 Even if two of defendant's admissions were inadmissible, defense counsel's failure to object would not amount to deficient performance if the decision was part of a sound trial strategy. See *People v. Jackson*, 205 Ill. 2d 247, 259 (2001) (defendant must overcome the strong presumption his defense counsel's action, or inaction, was part of a sound trial strategy). However, we fail to see how counsel's decision to forgo objecting to defendant's admissions he was a felon and had possessed and sold an assault weapon was an objectively reasonable trial strategy. Defendant's defense, that his family was targeted due to his drug dealing activity, was presented without the admission that defendant was a felon, especially since the specific felony was never presented to the jury and was not tied to defendant's cannabis dealing. Also, while it may have been a reasonable strategy to not object to defendant's admission he possessed and sold the Glock, the same cannot be said for failing to object to the admission regarding the assault weapon, especially when defense counsel had successfully argued a motion *in limine* to bar images of defendant holding an assault weapon. Thus, we conclude defense counsel was

deficient for failing to object or move to redact the statements that defendant was a felon and he had possessed and sold an assault weapon.

¶ 44 Although we have concluded defense counsel's performance was deficient for failing to object to some of defendant's other crimes admissions, that does not end our analysis of whether defendant was denied effective assistance of counsel. "A defendant must show both unreasonable performance *and* prejudice to prevail on a claim of ineffective assistance of counsel; defendant cannot prevail if he fails to show one or the other." (Emphasis added.) *People v. Gray*, 2024 IL 127815, ¶ 32. Defendant argues his defense counsel's deficient performance prejudiced him because the result of the trial would have been different if defense counsel had objected and managed to keep these pieces of evidence from the jury. The State argues any risk of prejudice from defendant's admissions was slight because his defense was he was involved in the drug trade and the murders were committed as revenge or a message. Once defendant admitted he was a drug dealer, the State contends defendant's admission that he was a felon and had owned other weapons would not have swayed the jury. The State argues, more importantly, defendant was not prejudiced by the few instances of deficient performance because the admissible evidence of defendant's guilt was overwhelming.

¶ 45 "Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Brown*, 2024 IL 129585, ¶ 28. We agree with the State that defendant did not demonstrate a reasonable probability the results of the proceeding would have been different in light of the overwhelming evidence of his guilt. See *People v. Hayes*, 2022 IL App (4th) 210409, ¶ 60. Most damaging, defendant confessed to the murders. In addition, the physical evidence supported defendant's confession. Defendant's fingerprints were found on the weapon recovered outside the residence,

and the bullets recovered from the residence were fired from that weapon. The glass from the window broken in the rear of the residence was on the ground outside, indicating the window was broken from the inside, not by an intruder. The autopsy findings were consistent with defendant's confession that he argued with Quardreka and struck her in the face before shooting her and shooting C.T. at least twice. In addition, there was evidence defendant had previously sent threatening messages to Quardreka and video evidence of defendant scrolling through Quardreka's Apple watch in the early morning hours on the day of the murders. As defendant did not show prejudice, he cannot prevail on a claim of ineffective assistance of counsel.

¶ 46                                    2. *Allegedly Irrelevant Evidence*

¶ 47          Defendant also argues his defense counsel was ineffective for failing to object to statements about defendant's older daughter, specifically, defendant did not have a relationship with his older daughter and her mother was a prostitute who texted defendant nude photos. Defendant contends the statements were unnecessary and prejudicial. The State contends the comments were relevant to show motive and intent and the prejudicial effect did not substantially outweigh the probative value.

¶ 48          We agree the statements about the mother of defendant's older daughter being a prostitute and texting defendant nude photographs were relevant evidence of defendant's motive and intent. Defendant even acknowledges this in his appellate brief, stating "[t]he only issue for which the statements may be considered relevant is to show that [defendant] and Quardreka argued over messages in their phones."

¶ 49          As for the statement that defendant did not have a relationship with his older daughter, the State contends it was relevant and an opportunity to garner sympathy for defendant. We disagree. However, even if we assume defense counsel was ineffective for failing to object to

any of the statements, defendant cannot show prejudice. We have already concluded the evidence of defendant's guilt was overwhelming, so there is not a reasonable probability the result of the trial would have been different. See *Gray*, 2024 IL 127815, ¶ 32.

¶ 50                                    B. Mistrial

¶ 51         Defendant contends the trial court abused its discretion in denying his motion for a mistrial after an image of defendant holding an assault weapon, which was barred by an order *in limine*, was inadvertently shown on a screen in the courtroom. In granting the motion *in limine* to bar two images of defendant holding an assault weapon, the court had found them prejudicial and likely to mislead the jury. Defendant argues, inadvertent or not, displaying one of the inadmissible images to the jury was so prejudicial it deprived defendant of a fair trial.

¶ 52         The State acknowledges both images were inadmissible; it does not challenge the trial court's *in limine* ruling. However, the State argues defendant did not meet his burden of showing he was prejudiced by the inadvertent showing of the image or the court's denial of the motion for a mistrial was an abuse of discretion.

¶ 53         "A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). "Where a motion for a mistrial has been denied, in addition to establishing prejudice, an appellant must also demonstrate that admonishments and curative instructions from the circuit court could not remedy the damage from the improper comments." *People v. Pinkett*, 2023 IL 127223, ¶ 33. The inadvertent violation of an order *in limine*, then, will constitute a ground for mistrial only where the violation deprived the defendant of a fair trial. *People v. Hall*, 194 Ill. 2d 305, 342 (2000). The decision whether or not to grant a motion for mistrial is in the discretion of the trial court.

- 17 -

*People v. Bishop*, 218 Ill. 2d 232, 251 (2006).

¶ 54    Defendant contends he was denied a fair trial because the image encouraged the jury to consider defendant's propensity for committing crimes with guns. In its pretrial ruling, the trial court found the two images showing defendant holding what appeared to be an assault weapon were relevant and "all evidence of this type is prejudicial." It granted the motion *in limine* because the relevance was outweighed by the risk of confusing the issues and misleading the jury. However, after the image was inadvertently displayed, the court concluded a mistrial was not warranted because the image was only displayed for a few seconds. The court further explained its reasoning when defense counsel renewed the motion for a mistrial after the close of all evidence. The court clarified the image was not published to the jury; there was no explanation to the jury, no identification of defendant in the image, and no context for the image. The image just appeared on the screen for a few seconds. The court noted there was no indication of how many, if any, jurors saw the image and if any could comprehend its contents due to the limited time the image was visible. The court also relied on the fact that, while defense counsel did not want attention drawn to the image by giving a limiting instruction, the jury received a general instruction to only consider evidence admitted by the trial court. It should be noted the court and the two attorneys, who were familiar with both images, could not agree as to which of the two images appeared on the screen. Thus, we cannot say the brief portrayal of an inadmissible image was so egregious so as to deny defendant a fair trial or the court's denial of the motion for a mistrial was arbitrary, fanciful, or unreasonable. See *People v. Yankaway*, 2025 IL 130207, ¶ 59 ("An abuse of discretion occurs only where the circuit court's ruling is arbitrary, fanciful, or so unreasonable that no reasonable person could take the circuit court's view."). Therefore, we conclude no abuse of discretion occurred when the trial court denied defendant's

motion for a mistrial.

¶ 55                                    III. CONCLUSION

¶ 56            For the reasons stated, we affirm the trial court's judgment.

¶ 57            Affirmed.